2014-1071

———

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

———

IMPLANT DIRECT INT'L,

*Applicant-Appellant,*

v.

CLEAR CHOICE HOLDINGS, LLC,

*Opposer-Appellee,*

**APPEAL FROM THE TRADEMARK TRIAL AND APPEAL BOARD OF THE US PATENT AND TRADEMARK OFFICE,**

**IN PROCEEDING 91190485**

———

CORRECTED OPENING BRIEF OF IMPLANT DIRECT INT'L

———

WAGNER, ANDERSON & BRIGHT, P.C.
Patrick F. Bright, Esq. (CA bar no. 68709)
3541 Ocean View Blvd.
Glendale, CA 91208
Phone: 818-249-9300
Fax: 818-249-9335
E-mail: pbright@patentattorney.us
*Attorneys for Implant Direct Int'l*

## CERTIFICATE OF INTEREST

Counsel for Implant Direct Implant Direct Sybron Int'l., a Nevada Corporation, certifies the following:

1. The full name of every party represented by me is: Implant Direct Int'l, a Nevada corporation

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: Implant Direct Sybron Int'l, a Nevada corporation, is the real party in interest.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Implant Direct Sybron Int'l., a Nevada corporation

4. The name of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are appearing in this Court are:

   Patrick F. Bright, Esq. of Wagner, Anderson & Bright, P.C.

Dated: January 30, 2014                    /s/ Patrick F. Bright

                                           Patrick F. Bright
                                           *Attorney for Appellant*
                                           *Implant Direct Int'l.*

i

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**………………………………………..ix

**STATEMENT OF RELATED CASES**………………….................xii

**JURISDICTIONAL STATEMENT** ……………………………....1

**STATEMENT OF THE ISSUES** …………………………….……...1

**STATEMENT OF THE CASE** ………………….…………….4

**STATEMENT OF THE FACTS**……………………………….5

    **A.**    **History of Implant Direct**……………………………….5

    **B.**    **The REAL CHOICE Mark**.........................................6

    **C.**    **Implant Direct Manufactures/Sells 13 Varieties of Dental Implants, Pursuant to Niznick's Patents**……………….6

    **D.**    **Being able to Choose Among 13 Different Implant Direct Implants is a REAL CHOICE, and is Why Dr. Niznick Chose REAL CHOICE to Describe Implant Direct's Dental Implants**……………………………………………….6

    **E.**    **REAL CHOICE Dental Implant Centers**………………...7

    **F.**    **Clear Choice Manufacture No Dental Implants; It Just Buys Implants from Implant Vendors**……………….7

G.  Clear Choice and CLEARCHOICE DENTAL IMPLANT
    Centers.................................................................8

H.  REAL CHOICE Implants are Placed by General Dentists
    (GPs) Versus CLEARCHOICE's Advertising Warns
    Against using GPs......................................9

I.  Buying Dental Implants is a MAJOR Purchasing Decision:
    CLEARCHOICE Centers Charge $10,000 to $50,000 for a
    Dental Implant for One Jaw; REAL CHOICE GPs Charge
    Less.................................................9

J.  No Evidence of Actual Confusion, After Several Years of
    Both Companies Selling in 3 Major Cities.....................10

K.  CLEARCHOICE's (Unproven) Allegations of Initial
    Interest Confusion, a Doctrine this Circuit Has Never
    Adopted, and Which the TTAB properly Rejected...........11

L.  CLEAR CHOICE's (Unproven) Allegations of Dilution of
    CLEARCHOICE Mark, which the TTAB properly
    Rejected.................................................12

SUMMARY OF THE ARGUMENT...........................................13

ARGUMENT........................................................17

I.      **STANDARD OF REVIEW**……………………………………..17

II.     **WHETHER OR NOT LIKELIHOOD OF CONFUSION DETERMINED ON CASE-BY-CASE BASIS, AIDED BY APPLYING THOSE OF THE 13 *DuPont* FACTORS RELEVANT TO PARTICULAR CASE**………………………19

III.    **THIS COURT SHOULD <u>REVERSE</u> THE TTAB'S <u>DENIAL</u> OF REGISTRATION OF IMPLANT DIRECT'S MARK "REAL CHOICE" BECAUSE THE TTAB'S <u>CONCLUSION</u> OF <u>LIKELIHOOD OF CONFUSION</u> WAS <u>ERROR OF LAW</u>, BASED ON TTAB "<u>FACTUAL</u>" <u>FINDINGS</u> WHICH WERE <u>NOT</u> SUPPORTED BY <u>SUBSTANTIAL EVIDENCE</u>**……….23

      A.  <u>The REAL CHOICE and CLEARCHOICE DENTAL IMPLANTS Marks are NOT Similar, and the TTAB "Factual" Finding of Similarity is Unsupported by Substantial Evidence, Contrary to the Evidence, and Contrary to Law</u>……………........................................23

          1.    <u>The Two Marks are NOT Similar</u>……….24

            a.  <u>Proper Comparison, to Determine Whether or Not the Marks are Similar, is Comparing CLEAR to REAL, because CLEAR is the Only Word in</u>

**CLEARCHOICE DENTAL IMPLANTS**
**that Clear Choice Claims a Right to.**......24

2.  **But Even if, in Error, the Relevant Portions**
    **of the Marks are Considered to be**
    **CLEARCHOICE and REAL CHOICE,**
    **CLEARCHOICE and REAL CHOICE are**
    **NOT Similar**....................................26

3.  **CLEAR and REAL are NOT SIMILAR,**
    **based on this Circuit's 4 Factors for**
    **Determining Similarity of Marks—**
    **Appearance, Sound, Connotation and**
    **Commercial Impression; the TTAB's**
    **Erroneous Finding, that the Marks**
    **CLEAR CHOICE DENTAL IMPLANTS,**
    **and REAL CHOICE, are similar, is**
    **Unsupported by Substantial Evidence**....27

    a.  **Factor 1—Appearance of CLEAR versus**
        **appearance of REAL—Appearance NOT**
        **similar:**..................................28

    b.  **Factor 2—Sound of CLEAR versus sound**
        **of REAL—Sound NOT Similar:**.........28

      c. **Factor 3—Connotation of CLEAR versus Connotation of REAL—are NOT Similar:**......................................................29

      d. **Factor 4—"Commercial Impression"— Commercial Impression NOT Similar**...31

**B. Dissimilarity of the Marks Can be Sufficient to Disprove Likelihood of Confusion, without Reaching the Other 12 *DuPont* Factors**.........................……....33

**C. TTAB's Erroneous Reliance on CLEAR and REAL being Similar, because CLEAR and REAL are "Almost Anagrams," Taken Alone, Requires Reversal; CLEAR and REAL are NOT Anagrams of Each Other, and No Federal Circuit Case has Ever Held that Marks being Anagrams (or Almost Anagrams) of Each Other, Makes the Marks Similar**......................................................…....35

**D. Case Law Confirms that CLEARCHOICE and REAL CHOICE Cannot Properly be Found to be Similar**......................................................…....36

**E. Only One *DuPont* Factor Favors Clear Choice; All Other Relevant Factors Favors Implant Direct**.......37

F. **CLEARCHOICE and REAL CHOICE use Different Trade Channels**……………………………………39

G. **The TTAB Opinion Correctly Found there was No Evidence of Actual Confusion—this 7th Factor Favors Implant Direct**……………………………………...41

H. **It's Been Several Years with No Evidence of Actual Confusion—*DuPont* Factor 8 Favors Implant Direct; TTAB's Neutral Rating for this Factor is Clear Error of Fact**……………………………………………42

I. **The TTAB Opinion Correctly Found that CLEARCHOICE is NOT a Famous Mark, and So is NOT Entitled to the Heightened Degree of Protection that Famous Marks are Entitled to, Favoring Implant Direct**……………………………………………43

J. **The TTAB Opinion Correctly Found that Implant Direct had NOT Acted in Bad Faith in Choosing its Mark REAL CHOICE**…………………………………….43

IV. **THE REMAINING 5 *DuPont* FACTORS, WHICH THE TTAB FOUND WERE "NEUTRAL," FAVOR IMPLANT DIRECT**……………………………………………44

V.   THE TTAB <u>CORRECTLY REJECTED</u> ALLEGATIONS OF
     "INITIAL INTERESTEST CONFUSION".......................45

VI.  THE TTAB <u>CORRECTLY REJECTED</u> CLEAR CHOICE'S
     ALLEGATIONS THAT IMPLANT DIRECT'S REAL
     CHOICE MARK LIKELY TO <u>DILUTE</u> CLEAR CHOICE'S
     CLEARCHOICE DENTAL IMPLANTS MARK.................46

VII. CONCLUSION AND STATEMENT OF RELIEF
     SOUGHT.......................................................46

# TABLE OF AUTHORITIES

## CASES

*Blue Man Prods., Inc. v. Tarmann,*
    75 USRQ2d 1811 (TTAB 2005)..............................31

*Carefirst of MD., Inc. v. FirstHealth of the Carolinas Inc.,*
    77 USPQ2d 1492 (TTAB 2005)..........................37, 39

*Citigroup, Inc. v. Capital City Bank Group, Inc.,*
    637 F.3d 1344 (Fed. Cir. 2011)............................19

*Champagne Louis Roederer, S.A. v. Delicato Vineyards,*
    148 F.3d 1373 (Fed. Cir. 1998)......................17, 32, 33

*Coach Services, Inc. v. Triumph Learning, LLC,*
    668 F.3d 1356 (Fed. Cir. 2012)....................19, 20, 31

*Colgate-Palmolive Co. v. Carter-Wallace, Inc.,*
    432 F.2d 1400, 167 USPQ 529 (C. C. P. A. 1970)....................35

*Consol. Edison v. NLRB,*
    305 U.S. 197, 59 S. Ct. 206, 83 L.Ed. 126 (1938)..................17, 18

*Cunningham v. Laser Golf Corp.,*
    222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000).....................24

*Federated Foods, Inc. v. Fort Howard Paper Co.,*
    544 F.2d 1098, 192 USPQ 24 (C.C.P.A. 1976).......................20

*Han Beauty, Inc. v. Alberto-Culver Co.,*
    236 F.3d 1333 (Fed. Cir. 2001)............................17

*Herbko Int'l., Inc. v. Kappa Bookss, Inc.,*
    308 F.3d 1156 (Fed. Cir. 2002)............................20

*Hester Industries Inc. v. Tyson Foods, Inc.,*
    2 USPQ2d 1646 (TTAB 1987)............................18

*In re Bayer Aktiengesellschaft*,
    488 F.3d 960 (Fed. Cir. 2007)................................................18

*In re Box Solutions Corp.*,
    79 USPQ2d 1953 (TTAB May 23, 2006)................................34

*In re Code Consultants, Inc.*,
    60 USPQ2d 1699 (TTAB 2001)...........................................24

*In re E.I. DuPont DeNeMours & Co.*,
    476 F.2d 1357 (C. C. P. A. 1973).....................................*passim*

*In re Majestic Distilling Co., Inc.*,
    315 F.3d 1311 (Fed. Cir. 2003)......................................19, 21

*In re Mighty Leaf Tea*,
    601 F.3d 1342 (Fed. Cir. 2010)...................................16, 17, 20

*In re Nat'l Data Corp.*,
    753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985)....................24, 30

*In re Pacer Tech.*,
    338 F.3d 1348 (Fed. Cir. 2003)......................................17, 18

*In re Save Venice New York, Inc.*,
    259 F.3d 1346 (Fed. Cir. 2001)...........................................16

*In re Sears, Roebuck & Co.*,
    2 USPQ2d 1312 (TTAB 1987)...........................................31

*In re SL&E training Stable Inc.*,
    88 USPQ2d 1216 (TTAB 2008)...........................................20

*In re TSI Brands, Inc.*,
    67 USPQ2d 1657 (TTAB 2002)...........................................35

*In re Viterra, Inc.*,
    671 F.3d 1358 (Fed. Cir. 2012).....................................*passim*

*Keebler Co. v. Murray Bakery Prods.*,
866 F.2d 1386, 9 USPQ2d 1736 (Fed. Cir. 1989)..................32, 33

*Kellogg Co. v. Pack'em Enterprises, Inc.*,
951 F.2d 330 (Fed. Cir. 1991)..........................................31, 32

*Knight Textile Corp. v. Jones Investment Co.*,
75 USPQ2d 1313 (TTAB 2005)..........................................35

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*,
633 F.3d 1158 (9th Cir. 2011)..........................................18

*Moto Venture, Inc. v. Ride Oklahoma, LLC*,
2009 WL 4086587 (TTAB 2009)........................................25

*Odom's Tennessee Pride Sausage, Inc. v. FF Acquisition, L.L.C.*,
600 F.3d 1343 (Fed. Cir. 2010)..........................................30

*Old Tyme Foods, Inc. v. Roundy's Inc.*,
961 F.2d 200 (Fed. Cir. 1992)..........................................26

*On-Line Careline v. Am. Online Inc.*,
229 F.3d 1080, 56 USPQ2d 1471 (Fed. Cir. 2000)............19

*Packard Press, Inc. v. Hewlett-Packard Co.*,
227 F.3d 1352 (Fed. Cir. 2000)..........................................26

*Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En
1772*, 396 F.3d 1368, 73 USPQ2d 1689 (Fed. Cir. 2005).....................25

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
469 US 189, 105 S.Ct. 658 (1985)......................................42

*Paula Payne Prods. Co. v. Johnson Publ'g Co.*,
473 F.2d 901 (C.C.P.A. 1973)..........................................19

*Sensiet Technologies Corp. v. SensoryEffects Flavor Co.*,
613 F.3d 754 (8th Cir. 2010)..........................................44

*Shen Mfg. Co. v. Ritz Hotel, Ltd.*,
    393 F.3d 1238 (Fed. Cir. 2004)………………………………….....17

*Software, Inc. v. M2 Commc'ns, Inc.*,
    405 F.3d 1378, 78 USPQ2d 1944 (Fed. Cir. 2006)………………..21

*Swatch, S.A. v. Beehive Wholesale, LLC*,
    888 F. Supp. 2d 738 (E.D. Va. 2012)………………………………..38

*Toro Co. v. GrassMasters Inc.*,
    66 USPQ2d 1032 (TTAB 2003)…………………………………….35

*Vail Associates, Inc. v. Vend-Tel-Co.*,
    516 F.3d 853, (10th Cir. 2008)……………………………………..44

*Weiss Associates, Inc. v. HRL Associates, Inc.*,
    902 F.2d 1546 (Fed. Cir. 1990)……………………………………...44

*Zenith Elecs. corp. v. Exzec, Inc.*,
    182 F.3d 1340 (Fed. Cir 1999)…………………………………….42

## STATUTES

15 U.S.C § 1052(d)………………………………………………….....1, 18

28 U.S.C § 1295(a)(4)(B)……………………………………………….1

## FEDERAL RULES OF APPELLATE PROCEDURE

Fed. R. App. Pro. 3(d)………………………………………………….1

Fed. R. App. Pro. 4(a)………………………………………………….1

## FEDERAL RULES OF EVIDENCE

Fed. R. Evid. 201(f) (2011)…………………………………………...10

## STATEMENT OF RELATED CASES

The following statement is made pursuant to Federal Circuit Rule 47.5:

This appeal is the only appeal from the 8/26/13 decision of the Trademark Trial and Appeal Board (TTAB) of the United States Patent and Trademark Office ("PTO"), which denied registration of Implant Direct's Application to Register the trademark REAL CHOICE, finding likelihood of confusion with Clear Choice Holdings, LLC's registered trademark CLEARCHOICE DENTAL IMPLANTS. Implant Direct Int'l. (hereinafter "Implant Direct") is unaware of any other appeal from the same TTAB Decision.

## JURISDICTIONAL STATEMENT

(1)　Pursuant to Section 2(d) of the Trademark Act, 15 USC 1052(d), the Trademark Trial and Appeal Board of the United States Patent and Trademark Office ("TTAB"), had subject-matter jurisdiction to rule on Implant Direct Implant Direct Int'l.'s ("Implant Direct") Application to register the trademark REAL CHOICE.

(2)　This Court has jurisdiction over the TTAB's 8/26/13 Decision ("TTAB Decision"), here appealed, pursuant to 28 U.S.C. §1295(a)(4)(B).

(3)　This appeal appeals the TTAB Decision that denied Implant Direct Implant Direct Int'l.'s ("Implant Direct") Application to register the trademark REAL CHOICE, sustaining the Opposition to registration of Clear Choice Clear Choice Holdings LLC ("Clear Choice" or "ClearChoice"), on the ground that "there would be **likelihood of confusion** with Clear Choice's registered trademark CLEARCHOICE DENTAL IMPLANTS,  if REAL CHOICE were registered by the US Patent and Trademark Office ("PTO" hereafter)."

(4)　Pursuant to Rules 3(d) and 4(a) of the Federal Rules of Appellate Procedure, Implant Direct, on 10/8/13, timely appealed  (A0967) to this Circuit.

## STATEMENT OF THE ISSUES

The issues on this appeal are:

(1) Reviewing, **de novo**, the TTAB's **conclusion** of **likelihood of confusion**, should this Circuit **reverse** the TTAB's denial of Implant Direct's Application to register Implant Direct's mark, REAL CHOICE; that conclusion was error of law, because based on "facts" TTAB found,  that were unsupported by substantial evidence.

(2) Reviewing, for **substantial evidence**, the TTAB's **factual findings**, should this Circuit reverse those **factual findings**, as **NOT being supported by substantial evidence**, and upon doing so, should this Circuit reverse the TTAB's refusal to register REAL CHOICE, because:

A. the TTAB "factual" finding that the marks were **similar** was error, **contrary** to the record below, because REAL and CLEAR are **not similar in appearance**, do **not sound the same**, have completely **different dictionary definitions** (aka "connotation"), and do **not** make a **similar "commercial impression"**;

B. the TTAB "factual" finding, on *DuPont*[1] factor three, that the **trade channels** for **both marks were the same** was based solely on the presumption that if the services are the same, trade channels are the same; but that presumption is rebuttable, and the evidence below established that the **trade channels** are different; 95% of the dental providers who are purchasing and implanting Implant Direct's dental implants, as REAL CHOICE dental implant centers, are **general dentists** ("GPs"), whereas CLEARCHOICE DENTAL IMPLANT centers claim only dental specialists (ie, orthodontists and periodontists) place their implants, and advertise, warning persons needing dental implants **not** to have general dentists place their implants.

C. the fourth *DuPont* factor-- conditions under which, and buyers to whom, sales are made, i.e., "impulse" vs. careful, sophisticated purchasing—was in Implant Direct's favor, because dental implants cost $10,000 to $50,000 per jaw; because of the high cost, and because it is

L
[1] *In re E.I. DuPont DeNemours & Co.,* 476 F.2d 1357, 1361 (CCPA 1973), listing 13 factors for determining if there is likelihood of confusion between two marks.

2

medical care, persons seeking implants pay attention to what person/entity they choose to place their implants; the TTAB "factual" finding that this factor was "neutral" is contrary to the uncontroverted evidence below.

    D. The TTAB correctly found **no evidence of actual confusion** (DuPont factor 7), despite REAL CHOICE implant centers and CLEARCHOICE DENTAL IMPLANT centers competing head to head in 3 major cities for 4.5 years (DuPont factor 8), but gave no weight to absence of actual confusion, finding that 4.5 years of co-existence in 3 major cities without any actual confusion was "neutral". This "neutral" finding is unsupported by substantial evidence, and contrary to the evidence below.

    E. The TTAB Opinion correctly found the mark CLEARCHOICE DENTAL IMPLANTS is **not** famous (DuPont factor 5);

    F. The TTAB Opinion (A040) correctly found that Implant Direct had **not** acted in **bad faith** in selecting the mark REAL CHOICE. This finding was consistent with Dr. Niznick's testimony that Implant Direct chose REAL CHOICE to emphasize that the 13 different types of Implant Direct dental implants, which REAL CHOICE dentists offer, provide prospective implant recipients a real choice.

    (3) Should this Circuit reverse the TTAB's refusal to register Implant Direct's mark, REAL CHOICE, because Clear Choice, as the party opposing registration of REAL CHOICE, **bore the burden of proving**, by a preponderance of the evidence, that registration of REAL CHOICE was **likely to cause confusion** with Clear Choice's mark CLEARCHOICE DENTAL IMPLANTS, and Clear Choice **failed to sustain** its **burden of proof**.

    (4) Should this Circuit order the PTO to register Implant Direct's mark REAL CHOICE, because TTAB's refusal to register the mark was

3

based on TTAB's "likelihood of confusion" conclusion, which was error of law, based on "facts" unsupported by substantial evidence.

## STATEMENT OF THE CASE

On 1/20/09, Implant Direct filed Application No. 77/652,784, in the PTO, applying to register Implant Direct's trademark REAL CHOICE. (Application is A04-A06)

Clear Choice on 6/3/09 timely filed Clear Choice's Opposition No. 91190485 in the USPTO (A042-A057) opposing registration of the REAL CHOICE mark. This opposition primarily argued **initial interest confusion**, but additionally argued **likelihood of confusion** under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), and dilution of Clear Choice's registered trademark CLEARCHOICE DENTAL IMPLANT CENTERS.

The Trademark Trial and Appeal Board ("the Board") instituted a proceeding regarding the Application/Opposition (A051-A054). On 7/7/09, Implant Direct answered the Opposition. (A055-A058). On 7/28/09, Clear Choice filed its First Amended Notice of Opposition (A063-A067). On 8/4/09, Implant Direct filed its Answer to the First Amended Notice of Opposition (A064-A071).

Implant Direct/Clear Choice submitted all evidence by Notice of Reliance. Clear Choice filed its Notice of Reliance on 5/2/12(A076-A079). Implant Direct filed its Notice of Reliance on 6/21/12 (A0753-A0756). On 10/18/12, both parties filed their Joint Supplemental Notice of Reliance (A0758-A0831). No evidence was presented live, to the TTAB.

Clear Choice filed its Opening Brief on 10/19/12 (A0832). Implant Direct filed its Brief on 11/18/12 (A0872). Clear Choice replied on 12/4/12 (A0918).

The TTAB heard oral argument on 8/13/12 (No transcript is available

from TTAB). On 8/26/13, the PTO issued the TTAB's Opinion denying registration of Implant Direct's REAL CHOICE mark. (A019-A041). Implant Direct timely appealed to this Circuit (A0967), filed 10/08/13 in PTO.

## STATEMENT OF FACTS

### A.  History of Implant Direct

Implant Direct International, LLC was formed in 2004 (A0324: Niznick Depo., 11:16-18) and has been manufacturing and selling dental implants and related products throughout the U.S. since October 2006 (A0325: Niznick Depo., 13:2). Dr. Niznick was then President and CEO of the company (A0323; Niznick Depo., 8:21-23). Following Implant Direct's merger with Sybron in 2010, the company's name changed to Implant Direct Sybron, LLC (Niznick Depo., 11:25) (hereafter, "Implant Direct"). Dr. Niznick owns about 25% of the company.

Dr. Niznick is the inventor on numerous patents for dental implants, now assigned to Implant Direct. Implant Direct manufactures, sells, and distributes over 13 varieties of dental implants to dental professionals around the world, made pursuant to Niznick's patents (A0324). In addition to dental implants, Implant Direct sells related dental prosthetic components, abutments, drills and all other components of dental implants (A0323: Niznick Depo., 8:13-20). Implant Direct employs 260-270 workers (A0324: Niznick Depo., 9:3-9). Implant Direct manufactures dental implants in Los Angeles, CA, and ships from there (A0323: Niznick Depo., 5:23-24). Implant Direct has a call center in Santa Clarita, CA that provides customer service and marketing (A0323: Niznick Depo., 6:22-23). Its Las Vegas, NV, facility ships/handles the business of Niznick Enterprises, an affiliated company (A0323: Niznick Depo., 7:15-21). Implant Direct also has offices

in Israel and in Zurich, Switzerland for European distribution (A0323: Niznick Depo., 5:25-6:2). Implant Direct doesn't offer Real Choice websites to dentists in Europe (A0323; Niznick Depo., 7:11-13).

**B.** **The REAL CHOICE Mark**

Implant Direct owns the trademark REAL CHOICE, and the disputed PTO registration for REAL CHOICE (A0323, Niznick Depo., 7:22-25). Implant Direct applied to register "REAL CHOICE" in January 2009 (A04).

**C.** **Implant Direct Manufactures/Sells 13 Varieties of Dental Implants, Pursuant to Niznick's Patents**

Implant Direct makes and sells **13 different implants**, NOT just a single implant. (A0327: Niznick Depo., 23:4-7).

**D.** **Being able to Choose Among 13 Different Implant Direct Implants is a REAL CHOICE, and is Why Dr. Niznick Chose REAL CHOICE to Describe Implant Direct's Dental Implants**

Thus, when using an Implant Direct dental implant, the patient and patient's dental professional have a **real choice**, among the **13 different dental implants manufactured by Implant Direct**, from which patient and dentist can select the specific Implant Direct implant that will best meet the patient's dental implant needs. (A0327: Niznick Depo., 22:16-20).

It is because Implant Direct's multiple designs of dental implants give patients/dentists a **real choice** that Dr. Niznick named Implant Direct's dental implants "REAL CHOICE" (A0327). He did so to emphasize that Implant Direct's 13 varieties of dental implants give implant patients and their dentist a **real choice** from which the patient and dentist can select the specific Implant Direct implant which will best meet the patient's dental implant needs. (A0327: Niznick Depo., 22:16-20). Dr. Niznick did **not** take or derive the name REAL CHOICE, from the CLEARCHOICE DENTAL

IMPLANTS name. (A0328). On the contrary, Dr. Niznick chose the name REAL CHOICE to **distinguish** Implant Direct's **multiple designs** of dental implants, from the there-is-only-one-design dental implants sold by CLEARCHOICE (A0327).

## E. **REAL CHOICE Dental Implant Centers**

To be licensed as a Real Choice dental implant center, a dental professional must purchase 25 implants and a surgical kit from Implant Direct for a total price of around $5,500 (A0326: Niznick Depo., 19:6-24). In return, Implant Direct sets up a website for the dental professional, who is licensed to use the "REAL CHOICE" mark, the name Real Choice Dental Implant Center, and the trademark "Teeth-In-1-Day" (A0329: Niznick Depo., 19:11-14). Other than continuing to sell implants and related products to them, Implant Direct provides these licensees no additional benefit because of their status as licensees (A0326: Niznick Depo., 20:2-3).

## F. **Clear Choice Manufactures No Dental Implants; It Just Buys Implants from Implant Vendors**

Unlike Implant Direct, Clear Choice CLEARCHOICE does not itself manufacture any implants, or hold any patents on implants. (A0132). The mark CLEARCHOICE DENTAL IMPLANTS is used to identify "centers" (businesses) which place dental implants in people who purchase implant services at Clear Choice's "centers" (A0132). The CLEARCHOICE "centers" install dental implants purchased from implant manufacturers, such as NobelBiocare and Straumann, but **not** from Implant Direct. (A0132).

In contrast to Implant Direct's 13 different varieties of patented dental implants, which Implant Direct manufactures and sells, CLEARCHOICE DENTAL IMPLANT centers only offer one design of dental implant (from

7

whichever dental implant manufacturer Clear Choice is then purchasing dental implants). (A0144, A0325).

The only "choice" patients and dentists get to make at CLEARCHOICE DENTAL IMPLANT "centers," is the "choice" to accept that one design, or go elsewhere.

## G.     Clear Choice and CLEARCHOICE DENTAL IMPLANT Centers

Clear Choice has existed since 2005 (A0130: Boyd Depo., 10:16-18). Clear Choice registered the "CLEARCHOICE" mark for dental implant services in dental services in 2006 (A016, A0131; Boyd Depo., 15:8-9). Clear Choice owns a 100% share of ClearChoice Management Services, LLC ("CCMS") (A0130: Boyd Depo., 11:8-12). CCMS provides contract services and licenses Clear Choice's brand to dental implant centers (A0130: Boyd Depo., 12:18-20). CCMS holds leases to individual dental centers, and subleases the centers to dental professionals and their professional corporations ("PCs") (A0131: Boyd Depo., 13:9-12).

Neither Clear Choice, nor CCMS sells any product bearing the "CLEARCHOICE" trademark (A0132; Boyd Depo., 17:1-3).

Clear Choice and CCMS license individual dental centers the right to use the CLEARCHOICE DENTAL IMPLANT name on the center. (A0131: Boyd Depo. 14:21-24). There are licensed CLEARCHOICE DENTAL IMPLANT centers in 16 states and 34 cities.

Clear Choice also places advertising for all CLEARCHOICE DENTAL IMPLANT centers, and claims to have paid as much as $1 million per month for advertising of CLEARCHOICE, for an unspecified time period (A0157: Boyd Depo., 119:3-7). Though Clear Choice advertises mostly at the local level, it has advertised some nationally (A0148; Boyd Depo., 82:14-16).

8

Clear Choice negotiates with implant suppliers, and buys implants for placement at CLEARCHOICE DENTAL IMPLANT centers (A0132: Boyd Depo., 17:23-25). Clear Choice purchases implants from manufacturers like Straumann and NobelBiocare, but **not** from Implant Direct (A0132: Boyd Depo., 19:5-13). **No goods** have ever been sold/offered under the "CLEARCHOICE" mark (A0147: Boyd Depo., 78-79).

**H.** **REAL CHOICE Implants are Placed by General Dentists (GPs) Versus CLEARCHOICE's Advertising Warns Against Using GPs**

The majority of Real Choice dentists are general dentists (A0340, A0345, A0349: Niznick at 75, 93-95, and 111; see specifically A0345: Niznick Depo. at 94 stating: "95 percent of our customers are GPs.") In contrast, in its advertising, Clear Choice repeatedly warns prospective implant buyers to avoid GPs (A0144-A0146: Boyd Depo., 68-75; A0276-A0281: Deutsch Depo., 24-31, 35, and 40-43).

**I.** **Buying Dental Implants is a MAJOR Purchasing Decision: CLEARCHOICE Centers Charge $10,000 to $50,000 for a Dental Implant for One Jaw; REAL CHOICE GPs Charge Less**

The average market price to restore a wholly endentulous arch, e.g. a patient's lower jaw, at Clear Choice's CLEARCHOICE centers, is $30,000-$50,000 (A0136: Boyd Depo., 36:9-10). Clear Choice's implant centers normally charge fees in the range of $10,000-$30,000 to restore an arch (A0148: Boyd Depo., 84:5-20).

Implant Direct dental implants, installed by a REAL CHOICE licensed general practice dentist, cost in the range of $150 to $200, compared to $700 plus for clear choice NobelBiocare implants (A0325).

Clear Choice has run an advertisement in a Nevada newspaper in which the phrase "Real Choice" and 14 other phrases that include a modifier

and the term "choice" have been struck through (A0993). The ad reads, "Don't be confused! For dental implants and beautiful new teeth in just one day ... the choice is clear ... it's ClearChoice!" (A0993). This ad was referenced in Implant Direct's TTAB brief multiple times as "Exhibit 3," but could not be found in the record (A0885, A0891, A0897). Implant Direct asks this Court to take judicial notice of this advertisement which ran in the Las Vegas Review-Journal on November 8, 2010. Federal Rule of Evidence 201(d) states, "A court shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d) (2011). Federal Rule of Evidence 201(b)(2) states that "a judicially noticed fact must be one not subject to reasonably dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(f) (2011). This advertisement satisfies all of these requirements.

Taking judicial notice of this advertisement will not prejudice Clear Choice, who can address it in their opposition and at oral argument. Because the advertisement was issued by a source "whose accuracy cannot reasonably be questioned," this Court should take judicial notice of it.

**J.** **No Evidence of Actual Confusion, After Several Years of Both Companies Selling in 3 Major Cities**

REAL CHOICE and CLEARCHOICE have co-existed in the marketplace for 4 years (A0328: Niznick Depo., 27:5-9). Real Choice websites were first announced **4 years ago**, in Applicant's newsletter, early 2009).

There are 3 markets with both a ClearChoice Dental Implant Center

10

and a Real Choice dentist: San Francisco, Washington, D.C., and Atlanta (See Niznick Depo. at Exhibit 35).

Despite both marks co-existing, the TTAB Opinion (A033-A039) found, correctly, that there was **no evidence of actual consumer confusion** between the CLEARCHOICE DENTAL IMPLANT mark and the REAL CHOICE mark.

Clear Choice's witnesses Boyd and Deutsch admitted having **no evidence of actual consumer confusion** between the two marks (A0142-A0144: Boyd Depo., 58-61 and 66-67; A0275, A0278-A0280, A02840A0285: Deutsch Depo., 19-20, 32-33, 39, 56-58).

After these admissions to no evidence of actual confusion, Clear Choice did a faulty survey, trying to show "initial interest confusion" (A0498-A0522). That survey was so faulty it was properly excluded by the TTAB (A033-A039), after Implant Direct pointed out the defects in the survey (A0477-A0496). These defects included that Clear Choice's survey person, Dr. Rappeport, admittedly designed his never-was-one-like-this-before survey after ClearChoice had retained him to try to prove actual confusion. He concluded there was actual confusion without no supporting data, no survey, or other evidence of actual confusion.

## K. CLEARCHOICE's (Unproven) Allegations of Initial Interest Confusion, a Doctrine this Circuit Has Never Adopted, and Which the TTAB Properly Rejected

Clear Choice argued "initial interest confusion" (theory that it can violate the Lanham Act for a similar mark to capture initial consumer attention, even though no actual sale is completed as a result of the confusion), but submitted no evidence of initial interest confusion. This Court has **never adopted** the "initial interest confusion" doctrine. The

TTAB Opinion (A039) properly rejected Clear Choice's allegations of "initial interest confusion."

**L.**     **CLEARCHOICE's (Unproven) Allegations of Dilution of CLEARCHOICE Mark, which the TTAB Properly Rejected**

The TTAB also properly rejected CLEARCHOICE's allegations that registering REAL CHOICE would **dilute** Clear Choice's mark.

## SUMMARY OF ARGUMENT

This Circuit should **reverse** the TTAB's **denial** of Implant Direct's Application to register Implant Direct's trademark REAL CHOICE, and should order the PTO to register Implant Direct's REAL CHOICE trademark.

The TTAB Opinion (A041) denied registration solely for "**likelihood of confusion.**" The TTAB's **conclusion** that there is **likelihood of confusion** between Implant Direct's mark "REAL CHOICE", and Clear Choice's mark "CLEARCHOICE DENTAL IMPLANTS," is **reversible error of law**. That conclusion is based on "factual" findings which are unsupported by **substantial evidence**, and which are, in fact, **contrary to the uncontroverted evidence** presented to the TTAB.

Of the 13 factors set forth in *In re E.I. DuPont DeNe mours & Co.,* 476 F.2d 1357, 1361 (CCPA 1973)--which this Court uses to determine **likelihood of confusion**--the most important is **factor (1): are the marks similar or dissimilar**.

Factor (1) is **strongly** in Implant Direct's favor, because **the marks are NOT similar.** The only word in CLEARCHOICE DENTAL IMPLANTS, that Clear Choice claims to have a service mark right in, is the word CLEAR, not the words CHOICE, or DENTAL IMPLANTS. Therefore, the proper focus, to determine whether the marks in issue are similar, is whether CLEAR and REAL are similar. CLEAR and REAL are NOT similar in any of the 4 tests for similarity: appearance, sound, connotation or commercial impression. CLEAR and REAL do not look or sound the same, have completely different definitions, and therefore do not make similar commercial impressions.

The TTAB's finding that the two marks are similar is unsupported by

**substantial evidence.** That finding is **contrary to the evidence below**, to logic and grammar, and to common sense.

As regards the TTAB's nonsensical CLEAR and REAL are "almost anagrams" "finding", for why the marks are similar, "almost anagrams" was **not even argued** by Clear Choice at the TTAB. There is no case law that "almost anagrams" (or even actual anagrams) makes marks similar. This wacky "finding" appears to have **been made** up by the TTAB, **to attempt to alibi** the TTAB's erroneous conclusion of likelihood of confusion.

The TTAB Opinion (A025) found the parties had presented evidence on 8 DuPont factors: factor 1 (similarity of the marks ), factor 2 (similarity of services), factor 3 (similarity of trade channels), factor 4 (buyers to whom sales are made, including consumer sophistication), factor 5 (whether CLEARCHOICE mark is famous or not), factor 7 (whether or not there is any evidence of actual confusion), factor 8 (length of concurrent use of marks without evidence of actual confusion), and catch-all factor 13 (did Implant Direct act in bad faith in adopting its mark). The TTAB Opinion (A025) found the other DuPont facts to be "neutral or inapplicable."

In addition to the most important DuPont factor 1 (marks **not similar**), being strongly in Implant Direct's favor, every additional DuPont factor **is either in Implant Direct's favor, or is neutral**, other than factor 2 (whether both marks used to sell same product/service). As regards factor 2, both CLEAR CHOICE DENTAL IMPLANT centers and REAL CHOICE dentists, sell/place implant dental implants, though they sell totally different brands of dental implants, using different business models.

All 8 *DuPont* factors, which the TTAB Opinion considered, are in Implant Direct's favor, except for factor 2 (both marks are used for dental implant services). The TTAB "factual" findings against Implant Direct,

14

on some of those 8 factors, were reversible error, because those findings were contrary to the evidence below, and unsupported by substantial evidence:

**Factor (1)**: The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression--**Marks NOT Similar, this is the single most important _DuPont_ factor, which alone can determine no likelihood of confusion and it strongly favors Implant Direct.** TTAB finding the marks to be similar is error, is NOT supported by substantial evidence, and is contrary to the evidence;

**Factor (2):** The similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use—**services similar**, both CLEAR CHOICE DENTAL IMPLANT, and REAL CHOICE, are used for dental implant services. However, CLEARCHOICE DENTAL IMPLANT centers, and REAL CHOICE dentists, sell and implant **completely different brands of implants, using different groups of dental professionals.**

**Factor (3):** The similarity or dissimilarity of established, likely-to-continue trade channels—**Trade channels NOT Similar**. TTAB Opinion "finding" that the trade channels are similar is reversible error, because solely based on the **presumption** that similar services are distributed through similar channels. The evidence below **rebutted** that presumption. The uncontroverted evidence was that 95% of dentists selling and implanting Implant Direct dental implants, as REAL CHOICE dentist, are **general practice dentists.** Clear Choice advertising warns people **not** to get their dental implants from general practice

dentists, urging them instead to get their implants at CLEARCHOICE DENTAL IMPLANT centers, which claim to have only specialists (oral surgeons, periodontists) placing/restoring implants.

**Factor (4):** The conditions under which and buyers to whom sales are made, i.e., "impulse" vs. careful, sophisticated purchasing— **Supports Implant Direct because Dental Implants are Expensive, Consumers are Careful in Purchasing Expensive Medical Services/Products**. TTAB Opinion's "finding" that this factor is "neutral" is unsupported by substantial evidence. It is reversible error, **contrary** to the uncontroverted evidence that these are $10,000 to $50,000 per jaw medical purchases, which consumers are careful about purchasing.

**Factor (5):** The fame of the prior mark (sales, advertising, length of use)—**Supports Implant Direct--TTAB correctly found CLEARCHOICE mark is NOT famous**.

**Factor (7):** The nature and extent of any actual confusion. **Supports Implant Direct**—TTAB correctly found **no evidence of actual confusion.**

**Factor (8):** The length of time during and conditions under which there has been concurrent use without evidence of actual confusion— **Supports Implant Direct—several years of competition in 3 major cities with no actual confusion**. TTAB Opinion (A034) finds that CLEARCHOICE DENTAL IMPLANT centers and REAL CHOICE dentists have co-existed in 3 major cities for 4.5 years, with no actual confusion, yet finds this *DuPont* factor 8 to be "neutral." The "neutral" finding is error, because not supported by substantial evidence, and contrary to the evidence just stated.

16

**Factor (13):** Any other established fact probative of the effect of use. Clear Choice argued Implant Direct was in bad faith in adopting its REAL CHOICE mark. TTAB Opinion (A039-A040) correctly **declined to find bad faith**, and ruled that factor 13 was "neutral." Implant Direct chose its mark to compete, to emphasize that Implant Direct's 13 different dental implants offer the patient a REAL choice. This factor favors Implant Direct.

The TTAB Opinion (A040) erroneously scores the 8 relevant DuPont factors as neural or in Clear Choice's favor. So concluding was error of law, and unsupported by substantial evidence. Every one of these 8 factors support Implant Direct, except for factor 2 (both marks relate to dental implant services).

The TTAB Opinion (A025) also found that the other 5 DuPont factors (factors 6, 9, 10, 11 and 12) were "neutral." However, as the evidence shows, some of those factors favored Implant Direct.

This Circuit should reverse the TTAB, and should order the PTO to register Implant Direct's mark REAL CHOICE, because the TTAB's conclusion of likelihood of confusion is error of law, based on multiple erroneous "facts" that are unsupported by substantial evidence.

## ARGUMENT

## I.   STANDARD OF REVIEW

On appeal, this Circuit reviews **de novo** the TTAB's **conclusion**, that allowing registration of Implant Direct's mark REAL CHOICE, would cause **likelihood of confusion** with Clear Choice's registered trademark CLEARCHOICE DENTAL IMPLANTS. *In re Viterra, Inc.*, 671 F.3d 1358, 1361 (Fed. Cir. 2012), citing *In re Mighty Leaf Tea*, 601 F.3d 1342, 1346

(Fed. Cir. 2010). Review is **de novo**, of the TTAB's **conclusion** of **likelihood of confusion**, because the determination of likelihood of confusion is a legal determination. *Viterra, Id.* citing *In re. Save Venice New York, Inc.*, 259 F.3d 1346, 1351-52 (Fed. Cir. 2001). Similarly, the TTAB's "… interpretations of the Lanham Act and the legal tests it applies in measuring registrability" are legal conclusions, reviewed **de novo**. *Viterra, Id; Save Venice, Id.*

This Circuit reviews the TTAB's **factual findings** to see if they are supported by **substantial evidence**. *Viterra, Id.* As *Viterra, Id.*, states:

> "The **ultimate question of likelihood of confusion**, however, is based upon **factual underpinnings** that we **review** for **substantial evidence**. *In re Mighty Leaf Tea*, 601 F.3d at 1346. For example, the question of similarity between two marks and the relatedness of goods are factual determinations. *See Shen Mfg. Co. v. Ritz Hotel, Ltd*, 393 F.3d 1238, 1241 (Fed. Cir. 2004). Within the broader question of the similarity of the marks, determinations as to the appearance, sound, connotation and commercial impression of the marks are also factual in nature. *See Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1337 (Fed Cir. 2001) ("The Board's finding that the marks are similar in sound is a factual determination."); *Champagne Louis Roederer, S.A. v. Delicato Vineyards*, 148 F.3d 1373, 1375 (Fed. Cir. 1998) (referring to 'the Board's factual findings with respect to the dissimilarities of the marks in appearance, sound, significance or overall commercial impression.")

"**Substantial evidence**", per the controlling US Supreme Court and Federal Circuit cases, is '**such relevant evidence as a reasonable mind would accept as adequate' to support a conclusion**:

> "Substantial evidence is '"more than a mere scintilla" and [is] "**such relevant evidence as a reasonable mind would accept as adequate" to support a conclusion**.' *In re Pacer Tech.,* 338 F.3d 1348, 1349 (Fed. Cir. 2003) (quoting *Consol. Edison v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Accordingly, '[w]here two different conclusions may be warranted based on the evidence of record, the Board's decision to favor one conclusion over the other is the type of decision that must be sustained by this court as supported by substantial evidence.' *In re Bayer Aktiengesellschaft,* 488 F.3d 960, 970 (Fed. Cir. 2007)."

*Viterra,* supra at 1361, quoting the US Supreme Court *Consol. Edison v. NLRB,* plus Federal Circuit *Pacer Tech* and *Bayer* cases.

Clear Choice, as the party opposing registration of Implant Direct's mark REAL CHOICE, bore the burden of proving, by a preponderance of the evidence, that mark should not be registered, either because it would likely cause confusion among consumers with the CLEARCHOICE DENTAL IMPLANTS mark, or would dilute that mark. *See Hester Industries Inc. v. Tyson Foods, Inc.,* 2 USPQ2d 1646 (TTAB 1987) (burden of proof in an opposition proceeding is on the opposer); *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,* 633 F.3d 1158 (9th Cir. 2011) (dilution must be proven by preponderance of the evidence).

## II. WHETHER OR NOT LIKELIHOOD OF CONFUSION DETERMINED ON CASE-BY-CASE BASIS, AIDED BY

## APPLYING THOSE OF THE 13 *DuPont* FACTORS
## RELEVANT TO PARTICULAR CASE

Section 2(d) of the Lanham Act states, in pertinent part, that a trademark/service mark shall be refused registration only if it so resembles an earlier used, and registered, mark "as to be **likely**, when used on or in connection with the goods of the applicant, **to cause confusion**, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d). The Board determines likelihood of confusion by focusing on "whether the purchasing public would mistakenly assume that the applicant's goods originate from the same source as, or are associated with, the goods in the cited registrations." *In re Majestic Distilling Company, Inc.*, 315 F.3d 1311, 1314-1315 (Fed. Cir. 2003) (citing *Paula Payne Prods. Co. v. Johnson Publ'g Co.*, 473 F.2d 901 (CCPA 1973).

As this Court stated in, *e.g, Viterra*, supra at 1361, and *Coach Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356 (Fed Cir. 2012), whether **likelihood of confusion** exists, between a pre-existing trademark, and an additional trademark, if the additional trademark is registered by the PTO, is determined on a **case-by-case basis**, aided by the application of 13 factors set out in *In re E.I. DuPont De Nemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973); *Citigroup, Inc. v. Capital City Bank Group, Inc.*, 637 F.3d 1344, 1349 (Fed Cir. 2011*)* (citation omitted). Accord, case by case basis: *On-Line Careline v. Am. Online Inc.*, 229 F.3d 1080, 1085, 56 USPQ2d 1471, 1474 (Fed. Cir. 2000).

The 13 *DuPont* factors are: (1) The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. (2) The similarity or dissimilarity and nature of

20

the goods or services as described in an application or registration or in connection with which a prior mark is in use. (3) The similarity or dissimilarity of established, likely-to-continue trade channels. (4) The conditions under which and buyers to whom sales are made, i.e., "impulse" vs. careful, sophisticated purchasing. (5) The fame of the prior mark (sales, advertising, length of use). (6) The number and nature of similar marks in use on similar goods. (7) The nature and extent of any actual confusion. (8) The length of time during and conditions under which there has been concurrent use without evidence of actual confusion. (9) The variety of goods on which a mark is or is not used (house mark, "family" mark, product mark). (10) The market interface between applicant and the owner of a prior mark. (11) The extent to which applicant has a right to exclude others from use of its mark on its goods. (12) The extent of potential confusion, i.e., whether de minimis or substantial. (13) Any other established fact probative of the effect of use. *DuPont*, supra at 1361.

    *DuPont, Id.*, states that the 13 factors, if of record, **must** be considered: "In testing for likelihood of confusion, under Sec. 2(d), therefore, the following, when of record, **must** be considered: [list of 13 factors]."

    However, "not all of the *DuPont* factors are relevant to every case, and **only factors of significance to the particular mark need be considered**." *Viterra*, supra at 1361, citing *In re Mighty Leaf Tea*, 601 F.3d 1342, 1346 (Fed.Cir. 2010). For example, the TTAB can "focus . . . on dispositive factors, such as similarity of the marks and relatedness of the goods. *Herbko Int'l., Inc. V. Kappa Books, Inc.*, 308 F.3d 1156, 1164 (Fed Cir. 2002) (citation omitted), cited in *Coach*, supra 1366. For example, in

*Mighty Leaf Tea*, supra, the TTAB only considered 3 of the 13 *DuPont*
factors—(1) similarity and nature of the goods, (2) similarity of trade
channels, and (3) similarity of the marks. See *In re SL&E Training Stable
Inc.*, 88 USPQ2d 1216, 1217 (TTAB 2008) (citing *Federated Foods, Inc. v.
Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976),
only considered similarity of marks and that goods sold through similar trade
channels).

The TTAB Opinion (A022), here appealed, states:
"We determine likelihood of confusion by focusing on the question
whether the **purchasing public would mistakenly assume** that the
applicant's [services] originate from the same source as, or are associated
with, the [services] in the cited registrations." *In re Majestic Distilling
Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). We
consider all probative facts in evidence that are relevant to the likelihood
of confusion factors set forth in *In re E.I. du Pont de Nemours & Co.*,
476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). The parties have
presented evidence on the following *du Pont* factors: similarity of the
parties' marks (factor 1); similarity of their services (factor 2); similarity
of trade channels and the buyers to whom sales are made, including
consumer sophistication (factors 3 and 4); fame of opposer's mark (factor
5); the nature and extent of any actual confusion (factor 7); and the length
of time during and conditions under which there has been concurrent use
without evidence of actual confusion (factor 8). Opposer [Clear Choice]
also has submitted evidence concerning applicant's alleged bad-faith
intent in adopting its mark (*DuPont* factor 13; *see also, e.g., M2
Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 78 USPQ2d 1944,

1947(Fed. Cir. 2006)). We find the remaining factors to be neutral or inapplicable."

III.   **THIS COURT SHOULD <u>REVERSE</u> THE TTAB's <u>DENIAL</u> OF REGISTRATION OF IMPLANT DIRECT'S MARK "REAL CHOICE" BECAUSE THE TTAB's <u>CONCLUSION</u> OF <u>LIKELIHOOD OF CONFUSION</u> WAS <u>ERROR OF LAW</u>, BASED ON TTAB "<u>FACTUAL</u>" FINDINGS WHICH WERE <u>NOT</u> SUPPORTED BY <u>SUBSTANTIAL EVIDENCE</u>**

This Court should **<u>reverse</u>** the TTAB's **<u>denial</u>** of Implant Direct's Application to register the trademark "REAL CHOICE", and should order the PTO to register "REAL CHOICE."

The TTAB's **<u>conclusion</u>** that there is **<u>likelihood of confusion</u>** between the marks REAL CHOICE, and CLEARCHOICE DENTAL IMPLANTS, is **<u>reversible error of law</u>**, because that conclusion is based on (supposed) factual findings that are **<u>not</u>** supported by **<u>substantial evidence.</u>**

Far from being supported by substantial evidence, the key "facts" found by the TTAB Opinion are **<u>contrary to the evidence below</u>**, to logic and grammar, and to common sense.

As regards the TTAB's (A029) wacky "finding" that CLEAR and REAL are "almost anagrams", and therefore similar, no case holds that marks that are "almost anagrams" (or actual anagrams) makes them similar. Consider, for example "HOST" and "SHOT", which are anagrams, but wholly different in sound, spelling, pronunciation and connotation, just like CLEAR and REAL. The erroneous "almost anagrams" finding cuts against the TTAB's **<u>erroneous conclusion</u>** of likelihood of confusion.

A.   **<u>The REAL CHOICE and CLEARCHOICE DENTAL IMPLANTS Marks are NOT Similar, and the TTAB "Factual"</u>**

23

## Finding of Similarity is Unsupported by Substantial Evidence, Contrary to the Evidence, and Contrary to Law

The TTAB Opinion (A029) "factual" finding that the two marks are **similar** is reversible error. Rather than being based on substantial evidence, that "factual" finding is contrary to the evidence below, and contrary to law.

### 1. The Two Marks are NOT Similar

#### a. Proper Comparison, to Determine Whether or Not the Marks are Similar, is Comparing CLEAR to REAL, because CLEAR is the Only Word in CLEARCHOICE DENTAL IMPLANTS that Clear Choice Claims a Right to.

The only word that Clear Choice claims to have a service mark right to, in CLEARCHOICE DENTAL IMPLANTS, is the word "CLEAR".

This is because:

(1) Clear Choice's trademark registration application **expressly disclaimed** Clear Choice's having any right to the words "DENTAL IMPLANTS" (A015); and

(2) Clear Choice admitted, in deposition, that Clear Choice does **NOT** have a monopoly on the word CHOICE:

"Q. You do have a monopoly on the word 'choice', in other words?

A. No. I'm sorry. I agree with you. We do **not** have a **monopoly** on the **word 'choice'**." (A0139: Boyd Depo., p. 48 lines 21-24).

Accord: (A0276: Deutsch Depo., 21:23-25).

In addition, Clear Choice ran an advertisement in a Nevada newspaper (A0993) that listed REAL CHOICE, and 14 additional phrases that include a **modifier plus the word CHOICE**. In the ad, Clear Choice struck out the word CHOICE, in each of the 14 phrases, saying that: "Don't

24

be confused!  For dental implants and beautiful new teeth in just one day ...
the choice is clear ... it's ClearChoice!"  This 14 varieties of "SOMETHING
+ CHOICE" ad is consistent with the Boyd and Deutsch deposition
admissions that Clear Choice has **no monopoly** on the term "choice."

That leaves CLEAR as the only word that Clear Choice claims a
service mark right in, out of CLEARCHOICE DENTAL IMPLANTS.  As a
result, the focus is properly on the **word CLEAR, versus the word REAL**,
to determine whether the mark CLEARCHOICE DENTAL IMPLANTS **is,
or is not, similar** to Implant Direct's mark REAL CHOICE.

The TTAB Opinion (A028-A029) recognizes that **descriptive, or
disclaimed, portions** of a mark are entitled to **little weight** in likelihood of
confusion analysis:

> "It is well-settled that **disclaimed, descriptive matter** may have **less
> significance** in likelihood of confusion determinations. *See
> Cunningham v. Laser Golf Corp.*, 55 USPQ2d at 1846 ("Regarding
> descriptive terms, this court has noted that the '**descriptive
> component** of a mark may be given **little weight** in reaching a
> conclusion on the likelihood of confusion.'") (*quoting In re Nat'l
> Data Corp.*, 224 USPQ at 752); *In re Code Consultants, Inc.*, 60
> USPQ2d 1699, 1702 (TTAB 2001) (**disclaimed matter** is often "**less
> significant** in creating the mark's commercial impression"). Thus,
> though we compare the marks REAL CHOICE and CLEARCHOICE
> DENTAL IMPLANTS in their entireties, we give more weight to the
> distinctive portions of the two marks:  REAL CHOICE and
> CLEARCHOICE." [A028-A029; bold/underline added for emphasis].

In light of these admitted facts, and the law which the TTAB cited, it was
**error of fact and law** for the TTAB to find that the distinctive portions of

the two marks are REAL CHOICE and CLEARCHOICE. Clear Choice has
no monopoly on the word CHOICE, and expressly disclaimed any right to
the words "dental implants" in its registration application. (A015, A0139,
A0276)

If the TTAB had properly applied the case law the TTAB cited, the
TTAB would have focused solely on CLEAR versus REAL, to determine
whether or not the marks were similar, not on CLEARCHOICE versus
REAL CHOICE.

## 2. But Even if, in Error, the Relevant Portions of the Marks are Considered to be CLEARCHOICE and REAL CHOICE, CLEARCHOICE and REAL CHOICE are NOT Similar

Even assuming, contrary to Clear Choice's admission of no monopoly
on CHOICE, that the protectable service mark portions of the two marks
were REAL CHOICE and CLEARCHOICE, case law holds that in multi-
word marks, it is the **first word** that primarily determines similarity/lack of
similarity. Therefore, the following analysis of the 4 relevant factors of
**appearance, sound, connotation and commercial impression**, for
determining similarity/lack of similarity, focuses on REAL versus CLEAR,
the **first words** in the two marks at issue. "The first word is often important
in determining whether the marks are similar." *Moto Venture, Inc. v. Ride
Oklahoma, L.L.C.*, 2009 WL 4086587 (TTAB 2009) (quoting *Palm Bay
Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d
1369, 73 USPQ2d 1689, 1692 (Fed Cir. 2005) ("To be sure, [the second
term] is an important term in the mark, but [the first term] nevertheless
remains a **'prominent feature'** as the first word in the mark and the first
word to appear on the label. Not only is [the first term] prominent in the

26

commercial impression created by VCP's marks, it also constitutes the 'dominant feature' in the commercial impression created by Palm Bay's mark").

Here, the second word "CHOICE" should be given little or no weight. Clear Choice's witnesses admitted in deposition that Clear Choice has no monopoly on the use of the word CHOICE.

3. **CLEAR and REAL are NOT SIMILAR, based on this Circuit's 4 Factors for Determining Similarity of Marks— Appearance, Sound, Connotation and Commerical Impression; the TTAB's Erroneous Finding, that the Marks CLEARCHOICE DENTAL IMPLANTS, and REAL CHOICE, are Similar, is Unsupported by Substantial Evidence**

This Court repeatedly holds that similarity/dissimilarity of marks turns on 4 factors: (1) **appearance**, (2) **sound**, (3) **connotation** and (4) **commercial impression** of the marks in their entireties. *In re Viterra, Inc.*, 671 F.3d 1358, 1361 (Fed Cir. 2012); *Application of E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (C. C. P. A. 1973). "The similarity or dissimilarity of the marks in their entirety is to be considered with respect to appearance, sound, and connotation": *Packard Press, Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 1356 (Fed. Cir. 2000), citing to *DuPont*, 961 F.2d at 202-03, and *Olde Tyme Foods, Inc. v. Roundy's Inc.*, 961 F.2d 200, 202-03 (Fed. Cir. 1992).

"All relevant facts pertaining to appearance, sound, and connotation must be considered before similarity as to one or more of those factors may be sufficient to support a finding that the marks are similar or dissimilar." *Packard Press*, supra, *Id.*; *Olde Tyme Foods*, supra at

27

203.

In *Packard Press*, supra, this Circuit reversed the TTAB's finding that the marks PACKARD TECHNOLOGIES and HEWLETT-PACKARD were similar, because:

"We agree with Packard that the Board improperly dissected the marks. In this case, the Board only considered the similar commercial impression of part of the marks—the shared word PACKARD-before concluding that the marks were similar. See *Hewlett-Packard*, slip op. at 4-5-, 1999 WL 702477. However, the Board failed to make any findings at all as to the appearance or sound of the marks, and without any explanation, considered only the PACKARD portion of HEWLETT-PACKARD."

Applying the 4 factors--appearance, sound, connotation and commercial impressions--REAL and CLEAR are **not** similar, and it was error for the TTAB to conclude they were similar, because analyzing these factors shows **NO substantial evidence that the two marks are similar**:

a.     **Factor 1--Appearance of CLEAR versus appearance of REAL--Appearance NOT similar:**

CLEAR and REAL do not look the same, and are not spelled the same. Anyone who can read English can see CLEAR and REAL do **not** look the same, and are **not** spelled the same.

b.     **Factor 2--Sound of CLEAR versus sound of REAL--Sound NOT Similar:**

There is no substantial evidence—no evidence at all--to support the TTAB Opinion's finding (A029) that CLEAR and REAL sound the same. That finding is contrary to the evidence. CLEAR and REAL do **not** sound the same. REAL starts with an "R" sound and ends with an "L" sound. CLEAR starts with a "CL" sound and ends with an "R" sound. Contrary to

28

the TTAB Opinion (A029), the sounds in the middle of REAL and CLEAR
are **not** identical. The pronunciation guide symbols in Merriam Webster
Dictionary (which dictionary definitions the TTAB Opinion says the TTAB
is taking judicial notice of) is `klir for CLEAR, and `rē(-ə)l or `ri(-ə)l for
REAL.

Implant Direct cannot find any Federal Circuit case holding that
marks having different starting and ending sounds are similar, whether or
not the middle sound is the same. The TTAB Opinion cites no authority
supporting its "sound the same" finding. This is unlike the *Viterra* case,
supra, at 1366-67 where XCEED was denied registration as a trademark for
agricultural seed, because, when spoken, it **sounded** the same as the
registered X-SEED mark for agricultural seed.

### c. Factor 3--Connotation of CLEAR versus Connotation of REAL--are NOT Similar:

CLEAR and REAL do **not** have the same meaning (aka
"connotation"). The TTAB Opinion (A022-A024), quotes the Merriam
Webster Dictionary definition of CLEAR. That definition does **not** include
the word real. The TTAB Opinion also quotes the Merriam Webster
Dictionary definition of REAL. That definition does **not** include the word
CLEAR. There is therefore no substantial evidence supporting the following
Board finding (A029) that the **connotations of CLEAR and REAL are
related**:

> "Applicant disputes opposer's contention that CLEAR and REAL
> have similar meanings. Nonetheless, opposer provided a thesaurus
> listing "real" as one of many synonyms for the adjective "clear."[6]
> Although we do not view the phrases REALCHOICE and

CLEARCHOICE as exact synonyms, **their connotations are related**."

The connotations of CLEAR and REAL are different, not related, as shown by the Merriam Webster Dictionary definitions of CLEAR and REAL the TTAB quotes. These definitions, in the dictionary's order, for CLEAR, used as an adjective, are: "bright, luminous, cloudless, untroubled, serene, clean, pure, transparent, unmistakable, keen, sure, innocent, net, unqualified, absolute, bare, denuded." **None** of these definitions **connotes choosing among several actual alternatives.**

In contrast, the Merriam Webster Dictionary definition of REAL (A023-A024), used as an adjective, are, in the dictionary's order: of or relating to fixed, permanent, or immovable things (as lands or tenements); not artificial, fraudulent, or illusory: **GENUINE**; occurring in or existing in actuality, of or relating to practical or everyday concerns or activities, existing as a physical entity and having properties that deviate from an ideal, law or standard; having objective independent existence; FUNDAMENTAL, ESSENTIAL, COMPLETE, UTTER. Therefore, REAL CHOICE connotes that REAL CHOICE dental implant centers give patients a **GENUINE CHOICE** (specifically, a choice among the 13 different types of dental implants Implant Direct provides).

The TTAB's finding that the connotations of CLEAR and REAL are "related" is also unsupported by a fair reading of the Thesaurus the TTAB cited (A022, A0939, A0942). There, the word "real" is the fiftieth word in that Thesaurus' list of 238 synonyms for "clear" used as an adjective. The first 64 of these 238 synonyms are:

"1. light, sunny, sunshiny; cloudless, fair, unclouded, fine, mild.
2. bright, shining, radiant, brilliant; illuminated,

30

alight, lit, lighted; lambent, resplendent, beaming, irradiant,
lucent, luciferous; aglow, glowing, luminous, unclouded, fine, mild.
luminescent, incandescent; lustrous, nitid, sparkling,
glistening,
3. transparent, limpid, pellucid, translucent, crystalline,
diaphanous; glassy, transpicuous, hyaline.
4. pure, even, perfect, unadulterated, unmixed, unalloyed;
genuine, valid, true, **real**, authentic; unblemished,
clean, unmarred, flawless, faultless, orient,
stainless; unstained, unsullied, unpolluted, uncontaminated,
untainted, uncolored. …. [174 additional words]"

In the category 4 list, neither the word "real" nor many of others make sense
as synonyms for "clear."

  d.  **Factor 4—"Commerical Impression"—Commercial**
      **Impression NOT Similar**:

Implant Direct has found no Federal Circuit case where marks that are
different in appearance, sound, and connotation, as here, were held to make
the same "commercial impression." The TTAB Opinion cites none.

"Commercial impression" appears to be a factor precluding a finding
of likelihood of confusion between marks **similar in appearance, sound,**
**and connotation.** For example, *Odom's Tennessee Pride Sausage, Inc. v. FF*
*Acquisition, L.L.C.*, 600 F.3d 1343 (Fed. Cir. 2010), found no likelihood of
confusion between two pictorial trademarks, each being a picture of a little
farm boy wearing a hat, one used by Farm Fresh Supermarkets ("FF") for
supermarket services, and one used by Odam, on Odom's sausages and
breakfast sandwiches distributed primarily through retail grocery stores (aka
supermarkets). This Court held that these marks made different **commercial**
**impressions**, **precluding likelihood of confusion**:

> "Sufficient distinctions exist between the registered marks considered
> by the board and the applied-for mark to create a different commercial
> impression. The marks [each pictures of little farm boys wearing hats]
> differ in the size and shape of the boys' hands and feet, the shape and

31

style of their hats, and the fact that FF's boy has a piece of straw in his mouth and shoes on his feet while Odom's has neither. Odom's complains that the board inappropriately dissected the marks into these components in performing its analysis, but it is these individual aspects that collectively create a difference in the overall impressions made by the marks. *In re Nat'l Data Corp.,* 753 F.2d 1056, 1058 (Fed.Cir.1985) ("[I]n articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark. . . ."). As the board correctly concluded, the **visual distinctions between the marks at issue here create unquestionably different commercial impressions, thereby precluding a finding of likelihood of confusion**." [bold/underline added for emphasis].

See *Coach Services, Inc. v. Triumph Learning*, LLC, 668 F.3d 1356, 1368 (Fed. Cir. 2012) where identical marks, COACH, were held NOT similar: "although the marks are identical in terms of sign and sound, they differ as to connotation and commercial impression." *Coach, Id*, cites *Blue Man Prods, Inc . v. Tarmann*, 75 USPQ2d 1811, 1820-21 (TTAB 2005), where the TTAB held BLUE MAN GROUP and BLUEMAN created different connotations and different commercial impressions, despite each mark containing the term "BLUE MAN". *Coach, Id.*, also cites *In re Sears, Roebuck & Co.*, 2 USPQA2d 1312, 1314 (TTAB 1987), where the identical marks, CROSSOVER for bras, and CROSSOVER for ladies' sportswear, were found by the TTAB to have "different meanings when applied to the goods of applicant and registrant, the two marks create different commercial

32

impressions, notwithstanding the fact that they are legally identical in sound and appearance."

**B.** **Dissimilarity of the Marks, Can be Sufficient to Disprove Likelihood of Confusion without Reaching the Other 12 _DuPont_ Factors**

Alone, dissimilarity of two marks makes it **unlikely** that confusion would result from the simultaneous use of the marks.  See _Kellogg Co. v. Pack'em Enterprises, Inc._, 951 F.2d 330, 333 (Fed Cir. 1991), where this Court held that a single DuPont factor, **dissimilarity of the two marks**, alone precluded likelihood of confusion between FROOT LOOPS (for breakfast cereal and other products)  and FROOTEE ICE (for flavored liquid frozen into bars):

> "We know of no reason why, in a particular case, a single _DuPont_ factor may not be dispositive.  _DuPont_ recognized that in determining likelihood of confusion 'each case must be decided on its own facts.' _DuPont_, 476 F.2d at 1361, 177 USPQ at 567.  It also recognized that 'each of the thirteen elements' may from case to case play a dominant role.' Id.  The court noted examples of cases in which a particular element made confusion likely or unlikely.  _Id._ at 1362, 177 USPQ at 567.

> In the present case, the Board ruled that the **dissimilarity** of 'the marks in their entireties' itself made it unlikely that confusion would result from the simultaneous use of the marks.  We cannot say that the Board committed any legal error in so holding."

In _Champagne Louis Roederer, S.A. v. Delicato Vineyards_, 148 F.3d 1373, 1375 (Fed. Cir. 1998), this Court rejected Appellant Roederer's argument that it was error of law for the TTAB to rely **solely on dissimilarity of the marks**, in evaluating likelihood of confusion, and to fail to give weight to the other _DuPont_ factors, **all of which were found to**

**favor Roederer**. This Court held that Applicant's mark CRYSTAL CREEK (for wine) was **unlikely to cause confusion** with Roederer's already registered marks CRISTAL and CRISTAL CHAMPAGNE, stating:

> "We have not been persuaded that, on this record, the Board erred in concluding that the **marks' dissimilarities were dispositive**, notwithstanding due weight being accorded to the *DuPont* factors found in Roederer's favor". [148 F.3d 1375].

Again, in *Keebler Co. v. Murray Bakery Prods*, 866 F.2d 1386, 1388, 9 USPQ2d 1736, 1739 (Fed. Cir. 1989), this Court stated "the more important fact for resolving the issue of likelihood of confusion …is the **dissimilarity** in commercial impression between the marks." So stating, this Court found no likelihood of confusion between the marks "PECAN SANDIES" and "PECAN SHORTEES", **despite many other DuPont factors favoring likelihood of confusion**:

> "While petitioner's ownership of a prior registration, the identity of the parties' goods and channels of trade, and petitioner's extensive use of its mark all are facts weighing on the side of a finding of likelihood of confusion, we **find that the more important fact**, for resolving the issue of likelihood of confusion in this case is the **dissimilarity** in commercial impression between the marks "PECAN SANDIES" and "PECAN SHORTEES".
>
> While opposer is correct that both marks contain the word "PECAN" and both marks contain words that begin with an 's' sound and terminate in an 'ees' sound, the marks are, nonetheless, readily distinguishable in appearance. More important, their principal point of similarity is the word "PECAN", which is, at least merely descriptive of a principal ingredient of both parties' cookies."

Here, the **dissimilarities** of REAL and CLEAR, even in REAL CHOICE and CLEARCHOICE, alone prove **no** likelihood of confusion. In addition

34

(as briefed at III infra), here, 11 of the 12 additional *DuPont* factors favor Impact Direct, unlike in *Keebler*, and *Champagne Louis Roederer, SA*, where the other DuPont factors weighed against Applicant. Yet Applicants won, because **dissimilarities** in the marks trumped the other *DuPont* factors.

**C.** **TTAB's Erroneous Reliance on CLEAR and REAL being Similar, because CLEAR and REAL are "Almost Anagrams," Taken Alone, Requires Reversal; CLEAR and REAL are NOT Anagrams of Each Other, and No Federal Circuit Case has Ever Held that Marks being Anagrams (or Almost Anagrams) of Each Other, Makes the Marks Similar**

The TTAB Opinion (A029) states that CLEAR and REAL are almost **anagrams,** and are therefore similar:

"Indeed, REAL is an anagram of CLEAR minus the 'c'."

Merriam-Webster's Collegiate Dictionary (10th Edition) definition of "anagram" is "a word or phrase made by transposing the letters of another word or phrase." Anagrams, therefore, have **identical** letters, arranged in different order. CLEAR and REAL are **not anagrams** of one another because REAL contains no "C."

The TTAB's finding of similarity because CLEAR and REAL are "anagrams minus the 'c'" is **reversible error.** REAL and CLEAR are **not** anagrams. Implant Direct has found no Federal Circuit case holding that marks that are anagrams/almost anagrams are similar, or that such a finding, even if accurate, is a factor in determining similarity or likelihood of confusion. Nor does the TTAB Opinion cite any such authority.

35

**D.**    **Case Law Confirms that CLEARCHOICE and REAL CHOICE Cannot Properly be Found to be Similar**

Case law confirms that CLEAR CHOICE and REAL CHOICE aren't similar.  In *In re Box Solutions Corp.*, 79 USPQ2d 1953 (TTAB May 23, 2006), the PTO refused to register "BOX SOLUTIONS" for "computer hardware, namely, communications servers," finding likelihood of confusion with the registered mark "BOX" for "computers and computer peripherals." The TTAB reversed, because "despite the legal identity of goods and the overlap in trade channels and customers, the marks are sufficiently dissimilar, particularly in view of the very weak nature of the common element BOX and the nature of the overlapping goods, which are not impulse-purchase items and are bought by sophisticated purchasers, such that confusion is not likely between applicant's BOX SOLUTIONS in stylized form mark and the cited registrant's BOX and design mark." *Id.* at 1958.  The TTAB found the "differences [in the marks] outweigh the similarities given the weakness of the common element.

See also *Colgate-Palmolive Co. v. Carter-Wallace, Inc.*, 432 F.2d 1400, 167 USPQ 529 (C. C. P. A. 1970) (because common element in marks is a common noun or adjectival word of everyday usage in the English language and has a laudatory or suggestive indication, PEAK PERIOD for personal deodorants is **not** confusingly similar to PEAK for dentrifice)." *Id.*

See also *Knight Textile Corp. v. Jones Investment Co.*, 75 USPQ2d 1313 (TTAB 2005) (finding no likelihood of confusion between the marks NORTON MCNAUGHTON ESSENTIALS and ESSENTIALS because "essentials" is a highly suggestive term when dealing with clothing and since purchasers were able to distinguish between marks using "essential" by looking to other aspects of the marks);

36

Accord: *Toro Co. v. GrassMasters Inc.*, 66 USPQ2d 1032 (TTAB 2003) (finding no likelihood of confusion between LAWN PUP and LAWN-BOY even though the marks shared one word, were used for the same type of goods, often sold side-by-side, and the opposer's mark was extensively advertised and used); *In re TSI Brands, Inc.*, 67 USPQ2d 1657 (TTAB 2002) (finding no likelihood of confusion between "AK American Khakis" and "AK" even though the marks were for similar goods).

### E. **Only One DuPont Factor Favors Clear Choice; All Other Relevant Factors Favors Implant Direct**

Only DuPont factor 2 favors Clear Choice. Both REAL CHOICE and CLEARCHOICE DENTAL IMPLANTS refer to dental implant services. DuPont factor 1 favors Implant Direct. The seven other relevant DuPont factors favor Implant Direct.

The TTAB correctly found no evidence of actual confusion, though CLEARCHOICE centers and REAL CHOICE centers have competed in 3 major cities for several years (DuPont Factors 7 and 8). These factors aren't neutral, as the TTAB found; they favor Implant Direct.

The TTAB correctly found that CLEARCHOICE is NOT a famous mark (DuPont factor 5).

The TTAB made erroneous factual findings against Implant Direct on DuPont factor 3 (whether or not channels of commerce the same), and on factor 4 (whether the purchasing decision is an impulse buy or a sophisticated major purchasing decision).

Buying dental implants is a **major, high cost, risky purchasing decision. Consumers choose their implant provider carefully,** and are unlikely to be confused, so factor 4 strongly favors Implant Direct, and isn't neutral, as the Board mistakenly found. The TTAB admits that dental

37

implants are very expensive, and admits that even ordinary consumers are likely to exercise greater care, and know with whom they are dealing, in purchasing health care services:

> "Under the fourth *du Pont* factor, we consider the conditions under which and buyers to whom sales are made. The evidence shows that dental implant services can be very expensive, costing from $10,000 to $50,000.7 We are constrained, however, to consider the parties' "dental implant services" as they are recited in the application and registration, which are not limited to services of any certain price. Moreover, there is no evidence establishing that purchasers of dental implants are sophisticated. The Board has previously noted that, "in purchasing healthcare services, even ordinary consumers are likely to exercise greater care and will know with whom they are dealing." *Carefirst of Md., Inc. v. FirstHealth of the Carolinas Inc.*, 77 USPQ2d 1492, 1504 (TTAB 2005). Yet even assuming that ordinary consumers tend to exercise some sophistication when purchasing healthcare services, careful or sophisticated purchasers are not immune from source confusion where similar marks are used in connection with related services.... We find that the similarities between the marks and the goods sold thereunder outweigh any sophisticated purchasing decision. **Thus, the fourth *du Pont* factor is neutral.**"

Purchasing dental implants is a major decision for a consumer, and is always very expensive. The descriptor "dental implant services" accordingly necessarily limits the services to a high priced category. A single jaw of dental implants, installed, costs from $10,000 to $50,000, involving sophisticated, not impulse, purchasing. Clear Choice's dental implant centers charge between $10,000-$30,000 to restore an arch (A0148: Boyd deposition, p. 84, lines 5-20). Even at Implant Direct's lower price of $10,000 per arch restoration, purchasing a dental implant is a **major financial decision,** made after careful research and consultation.

For these reasons, purchasers are unlikely to be confused in choosing between CLEARCHOICE DENTAL IMPLANT centers for dental implant services and REAL CHOICE dental implant centers, where GPs who buy and place implants from Implant Direct offer a real choice among 13 different Implant Direct implants.

**F.** **CLEARCHOICE and REAL CHOICE use Different Trade Channels**

The TTAB erred in finding that DuPont factors 2 and 3 favor Clearchoice by erroneously assuming the marks at issue are in the same channels of trade:

> "Because there are no limitations to the recitation of services in the application or opposer's [Clear Choice's] registration as to channels of trade and classes of purchasers, we must **presume** that the parties' services travel through all usual channels of trade and are offered to all normal potential purchasers…. Moreover, because the services described in the application and opposer's registration are identical, we **presume** that the channels of trade and classes of purchasers are the same…" [Emphasis/bolding added]

The TTAB's "same trade channels" finding is contrary to the uncontroverted evidence, resting solely on the **presumption** that like services are distributed through like trade channels. The uncontroverted evidence rebutted that presumption, establishing that Implant Direct and Clear Choice use differing business models, and distribute their services through different trade channels. REAL CHOICE dentists are 95% general practitioner dentists. By contrast, CLEARCHOICE centers use only oral surgeons and other dental specialists for their implant services.

39

CLEARCHOICE DENTAL IMPLANT centers' advertising warns consumers against using general practice dentist for implant services.

General practice dentists are NOT the same "trade channel" as oral surgeons and other dental specialists. They are two different groups of people. **These differences are consistent with the uncontroverted fact that there is no evidence of actual confusion.**

As the Court in *Swatch, S.A. v. Beehive Wholesale, LLC*, 888 F. Supp. 2d 738 (E.D. Va. 2012) explained, there is a presumption that similar goods will be sold in similar trade channels, but Courts review this "channels of trade" factor **de novo**, with the benefit of evidence of the actual facilities used by the parties:

> "The fourth [*DuPont*] factor examines the similarity of facilities used by the parties. '[W]hen there are basic differences between plaintiff's [registered mark] and defendant's [applicant to register mark] modes of distributing their product,' this factor does not favor the plaintiff. *CareFirst*, 434 F.3d at 273 (quotations omitted). Plaintiff argues that because both it and Defendant sell watches on the internet, in department stores and gifts stores, this factor weighs in its favor. **FN12** Though some overlap exists in each identified area, Swatch overstates the similarities between the parties' distribution facilities. Swatch sells the bulk of its products through Swatch-brand stores. Its stores are located in upscale malls, airports and urban areas. By contrast, Beehive operates primarily as a wholesaler and operates only two rural retail stores. As a wholesaler, Beehive refers to the network of independent retail stores as its primary consumer."

Footnote 12 from this quote states:

"FN12. The TTAB's consideration of this factor was limited. The TTAB found that it 'must assume that the goods are, or will be sold in all the normal channels of trade to all the usual purchasers for applicants' and opposer's goods would be the same. TTAB Op. at 20. **While the TTAB was constained by this assumption,** the Court reviews this factor **de novo** with the **benefit of evidence** of the actual facilities used by the Parties."

Here as there, the uncontroverted evidence rebuts the presumption of common channels of trade for the marks at issue. REAL CHOICE dentists are **95% general practitioner dentists.** CLEARCHOICE DENTAL IMPLANT centers advertise against using general dentists, urging consumers instead to use CLEARCHOICE DENTAL IMPLANT centers, and its dental specialists (oral surgeons, periodontists) for implant services. This "channels of commerce" factor favors Implant Direct, **not** Clear Choice, **and helps to account for the total absence of any evidence of actual confusion.**

G. **The TTAB Opinion Correctly Found there was No Evidence of Actual Confusion—this 7th Factor Favors Implant Direct**

The seventh DuPont factor – the nature and extent of any confusion – strongly favors Applicant. Opposer has no evidence of actual consumer confusion between the two marks (A0142-A0144: Boyd deposition at pp. 58-61 and 66-67; A0275, A0280, A0284-A0285: Deutsch deposition at pp. 19-20, 39, 56-58). Even the Rappeport survey, which is Opposer's only offer of evidence on actual confusion, fails to show actual confusion, or anything else relevant to this proceeding, i.e., the level of public recognition of "CLEARCHOICE" (A0278-A0279 Deutsch deposition at pp. 32-33).

41

Applicant knows of no actual confusion. With no evidence of actual confusion, this factor favors Applicant.

**H.** **It's Been Several Years with No Evidence of Actual Confusion—*DuPont* Factor 8 Favors Implant Direct; TTAB's Neutral Rating for this Factor is Clear Error of Fact**

The eighth DuPont factor – the length of time during and conditions under which there has been concurrent use without evidence of actual confusion – favors Implant Direct. Implant Direct's websites were first announced in Applicant's newsletter in early 2009 (A0328: Niznick deposition at p. 27, lines 5-9). Clear Choice Opposer had existed since 2005. Therefore, Implant Direct and Clear Choice had co-existed in the U.S. market for nearly five years with no actual confusion. The TTAB correctly found that:

"The parties had coexisted for approximately 4 ½ years at the time of the oral hearing, since application first used the REAL CHOICE mark in February 2009, without evidence of actual confusion. FN14 (citing Boyd transcript, Niznick Transcript, various exhibits). However, applicant contends, and opposer does not dispute, that there are only three markets where both marks are in use: Atlanta, San Francisco, and Washington, DC. FN15 (more evidence cites) limiting the opportunities for actual confusion to arise. ***DuPont* factor 8 is therefore neutral**."

This "neutral" finding is **contrary to the evidence**. On the contrary, four plus years of head to head competition in three major markets (Atlanta, San Francisco, Washington, DC) with no evidence of actual confusion (DuPont factor 8) strongly supports Implant Direct.

## I.  The TTAB Opinion Correctly Found that CLEARCHOICE is NOT a Famous Mark, and So is NOT Entitled to the Heightened Degree of Protection that Famous Marks are Entitled to, Favoring Implant Direct.

The fifth *DuPont* factor also Implant Direct. The TTAB (A031-A033) correctly held the CLEARCHOICE mark is NOT famous. ClearChoice's evidence fell "woefully short" of proving its marks were famous. **This Fifth *DuPont* factor favors Implant Direct**.

## J.  The TTAB Opinion Correctly Found that Implant Direct had NOT Acted in Bad Faith in Choosing its Mark REAL CHOICE

Catch-all DuPont factor 13 also favors Implant Direct. The TTAB (A040) correctly found that Implant Direct had **not** acted in **bad faith** in selecting the mark REAL CHOICE. Dr. Niznick said that Implant Direct selected REAL CHOICE to emphasize that the 13 different types of dental implants from Implant Direct, offered by REAL CHOICE dentists, gave patients seeking implants a real choice.

This Court has often said that the Lanham Act, and antitrust laws, share a common purpose: "fostering fair and unfettered competition." *E.g., Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1351-52 (Fed. Cir. 1999); citing *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 US 189, 198, 105 S.Ct. 658 (1985) (notes Congress enacted the Lanham Act to "foster competition").

There is nothing illegal about Implant Direct picking a mark emphasizing that REAL CHOICE dentists offer 13 different dental implants, and CLEARCHOICE DENTAL IMPLANT centers do not. ClearChoice's opposition subverts the Lanham Act's goal of fostering competition in

seeking to prevent Implant Direct from registering a mark that emphasizes this important market place difference.

## IV. THE REMAINING 5 *DUPONT* FACTORS, WHICH THE TTAB FOUND WERE "NEUTRAL," FAVOR IMPLANT DIRECT

*DuPont* factors 6, 9, 10, 11 and 12, contrary to the TTAB's neutral rating, also favor Implant Direct, based on the evidence.

**Factor (6):** The number and nature of similar marks in use on similar goods. Clearchoice ran an advertisement (A0993) in a Nevada newspaper in which REAL CHOICE and 14 other phrases that include the word CHOICE were struck through. The ad said: "Don't be confused! For dental implants and beautiful new teeth in just one day … the choice is clear … it's ClearChoice!" This advertisement concedes that there are many modifiers that can lawfully be used with the word "choice" to advertise dental implant services. "Real Choice," like the other marks cited in the advertisement, is distinct in name and in services from "ClearChoice". Clear Choice's ad, taken with ClearChoice's admission of no exclusive right to the word CHOICE, for implant services, favors Implant Direct.

**Factor (9):** The variety of goods on which a mark is or is not used (house mark, "family" mark, product mark). ClearChoice uses CLEARCHOICE DENTAL IMPLANTS only to describe implant service centers, and on no other goods/services. This favors Implant Direct.

**Factor (10):** The market interface between applicant (Implant Direct) and the owner of a prior mark (Clear Choice). **Limited market interface, supports Implant Direct**. The uncontroverted evidence

showed CLEARCHOICE DENTAL IMPLANT centers in 34 cities, with REAL CHOICE dentists in only 3 of those 34 cities.

**Factor (11):** The extent to which applicant has a right to exclude others from use of its mark on its goods. Clear Choice admitted no exclusive right to the word "choice," and expressly disclaimed any right to the words "Dental Implants." This factor favors Implant Direct.

**Factor (12):** The extent of potential confusion, i.e., whether de minimis or substantial. **None.** The marks are dissimilar in sound, meaning, connotation, and commercial impression, favoring Implant Direct.

## V.     THE TTAB <u>CORRECTLY REJECTED</u> ALLEGATIONS OF "INITIAL INTEREST CONFUSION"

This Court has declined to adopt the doctrine of "initial interest confusion". This doctrine therefore cannot provide an alternate ground to affirm the TTAB's decision, even if Clear Choice had some supporting evidence. It had none. W*eiss Associates, Inc. v. HRL Associates, Inc.*, 902 F.2d 1546, 1549 (Fed Cir. 1990), declined to adopt/support the doctrine of initial interest confusion, holding that:

> "Apparently the Board, at least in part, bottomed its decision on the concept of initial confusion. … **This court** however **does not** reach or **embrace this concept in deciding this case**. Such consideration, if ever, must be reserved for another time. Therefore, **we are not following this concept of initial confusion**,…"

Implant Direct has found no case where this Court adopted/supported initial interest confusion as a basis for refusing to register a mark. Even those Circuits which have adopted this doctrine require **admissible evidence from the party claiming there is initial interest confusion.** *See Vail Associates,*

*Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 872 (10th Cir. 2008) (finding no
initial interest confusion because the proponent's evidence was "minimal
and highly suspect"); *Sensiet Technologies Corp. v. SensoryEffects Flavor
Co.*, 613 F.3d 754, 766 (8th Cir. 2010) ("even if the marks are almost
identical, initial interest confusion is not assumed and must be proven by the
evidence"). ClearChoice **presented no admissible evidence** of initial
interest confusion.

**VI.    THE TTAB <u>CORRECTLY REJECTED</u> CLEAR
CHOICE'S ALLEGATIONS THAT IMPLANT DIRECT'S
REAL CHOICE  MARK WAS LIKELY TO  <u>DILUTE</u>
CLEAR CHOICE'S CLEARCHOICE DENTAL
IMPLANTS MARK**

Nor can the TTAB's decision be sustained on the ground that registering
REAL CHOICE could **dilute** ClearChoice's mark. The TTAB (A041)
**rejected** ClearChoice's dilution claim, finding correctly that ClearChoice
failed to prove any of the five factors required to sustain this claim (A033,
A041).

**VII.   CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

This Circuit should **reverse** the TTAB's **denial** of Implant Direct's
application to register Implant Direct's trademark REAL CHOICE, and
should order the PTO to register Implant Direct's REAL CHOICE
trademark.

The TTAB's **conclusion** that there is **likelihood of confusion**
between the marks "REAL CHOICE", and "CLEARCHOICE DENTAL
IMPLANTS," is **reversible error of law.** That conclusion is based on
(supposed) factual findings that are unsupported by **substantial evidence**,
and are in fact contrary to the uncontroverted evidence.

Of the 13 *DuPont* factors, the most important factor is **factor (1): are the marks similar. Factor (1), alone, can negate likelihood of confusion**. Factor (1) is **strongly** in Implant Direct's favor. The two marks are **NOT similar**. They do not look the same or sound the same, have completely different definitions, and do not make similar commercial impressions.

The only word in CLEARCHOICE DENTAL IMPLANTS that ClearChoice claims to have a service mark right in is the word CLEAR, not the words CHOICE, or DENTAL IMPLANTS. The proper comparison, to determine whether the marks in issue are similar appearance, is CLEAR to REAL. CLEAR and REAL are NOT similar in appearance, sound, connotation or commercial impression.

The TTAB's reliance on "almost anagrams" as a basis for finding similarity alone requires reversal. The TTAB's wacky "almost anagrams" finding is unsupported by the facts, and by any authority. This bizarre finding alone bespeaks, and typifies, TTAB's misunderstanding of the facts, and its misapplication of the applicable law, in reaching an incorrect decision on likelihood of confusion.

Other than factor 2, all other relevant DuPont factors favor Implant Direct. Consider:

*DuPont* **Factor (1)**: The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression--**Marks NOT Similar, this is the single most important *DuPont* factor, which alone proves no likelihood of confusion and strongly favors Implant Direct.** TTAB finding otherwise is NOT supported by substantial evidence, and is contrary to the evidence;

47

***DuPont* Factor (2):** The similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use—CLEAR CHOICE DENTAL IMPLANT centers, and REAL CHOICE dentists **sell and place different brands of implants, using different business models**;

***DuPont* Factor (3):** The similarity or dissimilarity of established, likely-to-continue trade channels—**Trade channels NOT Similar**. The uncontroverted fact is that 95% of dentists selling and placing/restoring Implant Direct dental implants, as REAL CHOICE dentists, are **general practice dentists.** Cleachoice advertising warns against employing general practice dentists for dental implant services, and urges using the services of specialists at CLEARCHOICE DENTAL IMPLANT centers.

***DuPont* Factor (4):** The conditions under which and buyers to whom sales are made, i.e., "impulse" vs. careful, sophisticated purchasing—**Supports Implant Direct.** Dental implants are expensive. Consumers are careful in purchasing expensive medical services/products. No one spends tens of thousands of dollars to undergo painful, risky dental surgery without careful analysis of the offering parties' merits and charges.

***DuPont* Factor (5):** The fame of the prior mark (sales, advertising, length of use)—**Supports Implant Direct--TTAB correctly found CLEARCHOICE DENTAL IMPLANTS mark is NOT famous**.

***DuPont* Factor (7):** The nature and extent of any actual confusion. **Supports Implant Direct—TTAB correctly found no evidence of actual confusion.**

*DuPont* **Factor (8)**:  The length of time during and conditions under which there has been concurrent use without evidence of actual confusion—**Supports Implant Direct—several years of competition in 3 major cities with no actual confusion**.

*DuPont* **Factor (13)**:  TTAB correctly declined to find Implant Direct had acted in bad faith in choosing the REAL CHOICE mark. This factor supports Implant Direct, because the uncontroverted evidence below was that Implant Direct chose its mark **to compete**, to emphasize that **Implant Direct's 13 different dental implants offer the patient a REAL choice.**

Nor could the TTAB's decision be sustained on the basis of "dilution" (which the TTAB correctly found did not apply), or on the basis of "initial interest confusion" (which the TTAB correctly found did not apply, and which this Court has never adopted).

This Court should reverse the TTAB, and order the PTO to register Implant Direct's mark REAL CHOICE. The TTAB's conclusion of likelihood of confusion is error of law, based on erroneous factual findings unsupported by substantial evidence.

49

Respectfully submitted,

Dated: January 30, 2014     by: _Patrick Bright_

Patrick F. Bright, Esq.
WAGNER, ANDERSON &
BRIGHT, P.C.
3541 Ocean View Blvd.
Glendale, CA 91208
Telephone: (818) 249-9300
Facsimile: (818) 249-9335
pbright@patentattorney.us
*Attorneys for Appellant-Applicant, Implant
Direct Int'l*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 12,348 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in Times New Roman 14-point font.


Dated: January 30, 2014          /s/ Patrick F. Bright_____
                                 Patrick F. Bright
                                 *Attorneys for Appellant-Applicant,*
                                 *Implant Direct Int'l*

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system. Participants in this case are registered CM/ECF users and will be served by the CM/ECF system.

Dated: January 31, 2014  /s/ Patrick F. Bright

          Patrick F. Bright, Esq.
          WAGNER, ANDERSON &
          BRIGHT, P.C.
          3541 Ocean View Blvd.
          Glendale, CA 91208
          Telephone: (818) 249-9300
          Facsimile: (818) 249-9335
          pbright@patentattorney.us

          *Attorneys for Applicant-Appellant*
          *Implant Direct Int'l*

52

# ADDENDUM

> THIS OPINION IS NOT A
> PRECEDENT OF THE TTAB

Hearing:                                                          Mailed:
August 13, 2013                                              August 26, 2013

## UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*Clear Choice Holdings LLC*
*v.*
*Implant Direct Int'l*

———

Opposition No. 91190485

———

Neal G. Massand and Brian A. Colao of Dykema Gossett PLLC for Clear Choice Holdings LLC.

Patrick F. Bright of Wagner, Anderson & Bright, P.C. for Implant Direct Int'l.

———

Before Quinn, Gorowitz, and Hightower, Administrative Trademark Judges.

Opinion by Hightower, Administrative Trademark Judge:

On January 20, 2009, applicant Implant Direct Int'l applied to register the mark REAL CHOICE, in standard characters, for dental implant services.[1] Opposer Clear Choice Holdings LLC opposes registration on the grounds that applicant's mark is likely to cause confusion with its mark CLEARCHOICE

---

[1] Application Serial Number 77652784, filed on the basis of a bona fide intention to use the mark in commerce pursuant to Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b). Applicant states in its brief that it is now Implant Direct Sybron International LLC ("IDS") and IDS now owns applicant's mark. Applicant's Brief at 9 n.1. However, no assignment has been recorded.

Opposition No. 91190485

DENTAL IMPLANTS pursuant to Section 2(d) of the Trademark Act, 15 U.S.C.
§ 1052(d), and also likely to cause dilution pursuant to Section 43(c) of the
Trademark Act, 15 U.S.C. § 1125(c). Both parties filed trial briefs, opposer filed a
reply brief, and a hearing was held on August 13, 2013.

<u>The Record</u>

The parties made the following evidence of record by stipulation:

- Deposition transcripts of the following fact witnesses, with exhibits:[2]

  o Steve Boyd, manager and a founder and owner of opposer;

  o Lawrence Deutsch, marketing director of opposer; and

  o Dr. Gerald Alvin Niznick, president and CEO of applicant.

- Deposition transcripts of the following expert witnesses, with exhibits:

  o Michael Rappeport, opposer's survey expert, and

  o Hal Poret, who prepared a critique of the Rappeport survey on
    behalf of applicant.

---

[2] The Boyd and Niznick discovery deposition transcripts may be offered in evidence at trial
because those witnesses are officers of the parties. Trademark Rule § 2.120(j)(1), 37 C.F.R.
§ 2.120(j)(1). Although no written stipulations are of record, it appears that the parties
stipulated to introduction of the discovery depositions of all other witnesses as trial
evidence. *See* Niznick Transcript at 112:1-12 ("Mr. Bright: One thing I do want to put on
the record . . . Mr. Colao and I have agreed, that these depositions, meaning the deposition
of ClearChoice under Rule 30(b)(6) where the witness was Mr. Boyd, Stephen Boyd, and the
testimony of Mr. Deutsch for ClearChoice and the testimony of Dr. Niznick, are both what
the Trademark Trial and Appeal Board calls discovery and evidentiary, meaning that they
can be used in the evidentiary phase of the opposition. Correct? Mr. Colao: Yes, they
can."). This stipulation is hereby approved. *See* Trademark Trial and Appeal Board
Manual of Procedure (TBMP) § 704.09 (3d ed. rev. 2 June 2013). The Board also will
receive in evidence the expert deposition transcripts submitted pursuant to the parties'
joint stipulation although they were untimely filed on October 18, 2012, after the close of
trial on August 20, 2012, as Exhibits 1 and 2 to the "Joint Supplemental Notice of
Reliance." The parties are advised that agreements to modify Board procedure should be
submitted to the Board for approval. *See* TBMP § 705 ("Subject to the approval of the
Board, parties may enter into a wide variety of stipulations concerning the admission of
specified matter into evidence.").

Opposition No. 91190485

All transcripts were introduced by notice of reliance. The parties are advised that otherwise admissible deposition transcripts are not admissible via notice of reliance but instead should be individually filed with the Board pursuant to the procedure identified in Trademark Rule § 2.125, 37 C.F.R. § 2.125.

The following additional evidence was made of record via notice of reliance:

- A status and title copy of opposer's pleaded Registration Number 3225921, as well as a certified copy of its file history;[3]

- The file history of the opposed application, Serial Number 77652784;[4]

- The following discovery documents:

  o Opposer's initial disclosures;

  o Opposer's response to applicant's interrogatories;

  o Opposer's response to applicant's request for production of documents;

  o Opposer's first amended response to applicant's interrogatories;

  o Applicant's responses to opposer's interrogatories;

  o Applicant's responses to opposer's requests for production of documents;

---

[3] Opposer also attempted to introduce copies of its other three pleaded registrations – Nos. 3553219, 3685880, and 3181966 – as Exhibit 3 to the "Joint Supplemental Notice of Reliance." However, opposer provided only plain copies of the registration certificates, which do not establish current status and title of the registrations. Pursuant to Trademark Rule § 2.122(d), this was not effective to make these registrations of record, and they are not in evidence. Furthermore, we take judicial notice of the fact that Registration No. 3181966 was cancelled July 12, 2013 pursuant to Section 8 of the Trademark Act. *See Nike Inc. v. WNBA Enters. LLC*, 85 USPQ2d 1187, 1193 n.9 (TTAB 2007); *Black & Decker Corp. v. Emerson Elec. Co.*, 84 USPQ2d 1482, 1487-88 n.10-12 (TTAB 2007); TBMP § 704.03(b)(1)(A).

[4] It was unnecessary to submit the file history of the opposed application, as it forms part of the record of the proceeding without any action by the parties. Trademark Rule § 2.122(b)(1); TBMP § 704.03(a). For the same reason, it also was unnecessary to submit the pleadings in the case by notice of reliance.

Opposition No. 91190485

      o  Applicant's supplemental responses to opposer's interrogatories;

      o  Opposer's survey report, prepared by Michael Rappeport of RL Associates, and verbatim survey responses;

      o  Expert report of Hal Poret, an analysis of opposer's survey prepared for applicant; and

      o  A series of letters and emails exchanged between opposer's counsel and applicant's principal.

All of these documents were proffered by opposer via notice of reliance.

It was improper for opposer to submit its own discovery responses. Trademark § 2.120(j)(5); Trademark Trial and Appeal Board Manual of Procedure (TBMP) § 704.10 (3d ed. rev. 2 June 2013). Additionally, letters, emails, and expert reports are not admissible by notice of reliance. Trademark Rule 2.122(e); TBMP § 704.08(a). However, applicant did not object to admission of any of these materials; in fact, applicant affirmatively incorporated by reference each of the documents submitted by opposer in its own notice of reliance. For these reasons, we hereby admit into evidence all the materials listed above for whatever persuasive value they may have.[5]

Finally, we take judicial notice of the excerpt from THE SYNONYM FINDER attached as Exhibit A to opposer's reply brief. We also take judicial notice of the following definitions of the adjectives "clear" and "real" on the Merriam-Webster Online Dictionary (m-w.com), referenced in applicant's brief, as available on the date of the oral hearing:

---

[5] We note that several of the documents also appear in the record as deposition exhibits.

Opposition No. 91190485

Definition of *CLEAR*
1 *a* : BRIGHT, LUMINOUS
  *b* : CLOUDLESS; *specifically* : less than one-tenth covered
  <a *clear* sky>
  *c* : free from mist, haze, or dust <a *clear* day>
  *d* : UNTROUBLED, SERENE <a *clear* gaze>
2 : CLEAN, PURE: as
  *a* : free from blemishes <*clear* skin>
  *b* : easily seen through : TRANSPARENT <*clear* glass>
  *c* : free from abnormal sounds on auscultation
3 *a* : easily heard <a loud and *clear* sound>
  *b* : easily visible : PLAIN <a *clear* signal>
  *c* : free from obscurity or ambiguity : easily understood :
  UNMISTAKABLE <a *clear* explanation>
4 *a* : capable of sharp discernment : KEEN <a *clear*
  thinker>
  *b* : free from doubt : SURE <not *clear* on how to proceed>
5 : free from guile or guilt : INNOCENT <a *clear*
  conscience>
6 : unhampered by restriction or limitation: as
  *a* : unencumbered by debts or charges <a *clear* estate>
  *b* : NET <a *clear* profit>
  *c* : UNQUALIFIED, ABSOLUTE <a *clear* victory>
  *d* : free from obstruction <*clear* passage>
  *e* : emptied of contents or cargo
  *f* : free from entanglement or contact <staying *clear* of
  controversy> <keep *clear* of the boundary>
  *g* : BARE, DENUDED <*clear* ground>


Definition of *REAL*
1 : of or relating to fixed, permanent, or immovable
  things (as lands or tenements)
2 *a* : not artificial, fraudulent, or illusory : GENUINE <*real*
  gold>; *also* : being precisely what the name implies <a
  *real* professional>
  *b (1)* : occurring or existing in actuality <saw a *real* live
  celebrity> <a story of *real* life> *(2)* : of or relating to
  practical or everyday concerns or activities <left school
  to live in the *real* world> *(3)* : existing as a physical
  entity and having properties that deviate from an ideal,
  law, or standard <a *real* gas> — compare IDEAL 3b
  *c* : having objective independent existence <unable to
  believe that what he saw was *real*>

Opposition No. 91190485

> *d* : FUNDAMENTAL, ESSENTIAL
> *e (1)* : belonging to or having elements or components that belong to the set of real numbers <the *real* roots of an equation> <a *real* matrix> *(2)* : concerned with or containing real numbers <*real* analysis> *(3)* : REAL-VALUED <*real* variable>
> *f* : measured by purchasing power <*real* income> <*real* dollars>
> *g* : COMPLETE, UTTER <a *real* fiasco>
> 3 *of a particle* : capable of being detected — compare VIRTUAL 3

*See UMG Recordings Inc. v. Mattel, Inc.*, 100 USPQ2d 1868, 1874 (TTAB 2011);

FED. R. EVID. 201(c)(1), (2); TBMP § 704.12.

<u>Standing and Priority</u>

We first consider opposer's standing to bring this opposition against the involved application. Opposer has established its ownership of pleaded Registration No. 3225921, issued April 3, 2007 for the mark CLEARCHOICE DENTAL IMPLANTS for "dental services, namely dental implant services." Opposer's standing to oppose registration of applicant's mark is established by its pleaded registration, which the record shows to be valid and subsisting, and owned by opposer. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000). In addition, because opposer's pleaded registration is of record, priority is not in issue with respect to the services identified in the registration, namely dental implant services. *Penguin Books Ltd. v. Eberhard*, 48 USPQ2d 1280, 1286 (TTAB 1998) (citing *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974)). There is no dispute that opposer has priority vis-à-vis applicant, which filed the involved application on an intent-to-use basis on January 20, 2009.

6

Opposition No. 91190485

<div align="center">Likelihood of Confusion</div>

"We determine likelihood of confusion by focusing on the question whether the purchasing public would mistakenly assume that the applicant's [services] originate from the same source as, or are associated with, the [services] in the cited registrations." *In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). We consider all probative facts in evidence that are relevant to the likelihood of confusion factors set forth in *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973).

The parties have presented evidence on the following *du Pont* factors: similarity of the parties' marks (factor 1); similarity of their services (factor 2); similarity of trade channels and the buyers to whom sales are made, including consumer sophistication (factors 3 and 4); fame of opposer's mark (factor 5); the nature and extent of any actual confusion (factor 7); and the length of time during and conditions under which there has been concurrent use without evidence of actual confusion (factor 8). Opposer also has submitted evidence concerning applicant's alleged bad-faith intent in adopting its mark (*du Pont* factor 13; *see also, e.g., M2 Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 78 USPQ2d 1944, 1947 (Fed. Cir. 2006)). We find the remaining factors to be neutral or inapplicable.

A.    Similarity of the Services, Channels of Trade, and Classes of Customers

We begin with the similarities or differences between opposer's and applicant's services, the second *du Pont* factor. It is settled that in making our determination regarding the relatedness of the parties' services, we must look to the services as identified in the application and opposer's pleaded registration. *See*

<div align="center">7</div>

Opposition No. 91190485

*Octocom Sys. Inc. v. Houston Computer Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). That is, because the scope of the registration applicant seeks is defined by its application (not by its use), it is the application (not its use) that we must look to in determining applicant's right to register:

> The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which sales of the goods are directed.

*Id.*

The services identified in opposer's Registration No. 3225921 for CLEARCHOICE DENTAL IMPLANTS are "dental services, namely dental implant services." The services identified in the application likewise are "dental implant services." Thus, the parties' services are identical.

The third *du Pont* factor assesses the similarity of the trade channels for the parties' services. Because there are no limitations to the recitation of services in the application or opposer's registration as to channels of trade and classes of purchasers, we must presume that the parties' services travel through all usual channels of trade and are offered to all normal potential purchasers. *See Citigroup Inc. v. Capital City Bank Group, Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011); *In re Jump Designs LLC*, 80 USPQ2d 1370, 1374 (TTAB 2006); *see also Paula Payne Prods. Co. v. Johnson Publ'g Co.*, 473 F.2d 901, 177 USPQ 76, 77 (CCPA 1973). Moreover, because the services described in the application and opposer's registration are identical, we presume that the channels of trade and

Opposition No. 91190485

classes of purchasers are the same. *See In re Viterra Inc.*, 671 F.3d 1358, 101
USPQ2d 1905, 1908 (Fed. Cir. 2012) (finding Board entitled to rely on this legal
presumption in determining likelihood of confusion); *American Lebanese Syrian
Assoc. Charities Inc. v. Child Health Research Inst.*, 101 USPQ2d 1022, 1028 (TTAB
2011).

The second and third *du Pont* factors weigh heavily in opposer's favor.

B.    Similarity of the Marks

We next address the *du Pont* likelihood of confusion factor focusing on the
similarity or dissimilarity of "'the marks in their entireties as to appearance, sound,
connotation, and commercial impression.'" *Palm Bay Imps. Inc. v. Veuve Clicquot
Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed.
Cir. 2005) (quoting *du Pont*, 177 USPQ at 567). In comparing the marks, we are
mindful that the test is not whether the marks can be distinguished when subjected
to a side-by-side comparison, but rather whether they are sufficiently similar in
terms of their overall commercial impression so that confusion as to the source of
the services offered under the respective marks is likely to result. *San Fernando
Elec. Mfg. Co. v. JFD Elecs. Components Corp.*, 565 F.2d 683, 196 USPQ 1, 3 (CCPA
1977); *Spoons Rests. Inc. v. Morrison Inc.*, 23 USPQ2d 1735, 1741 (TTAB 1991),
*aff'd*, No. 92-1086 (Fed. Cir. June 5, 1992).

Because the similarity or dissimilarity of the marks is determined based on
the marks in their entireties, our analysis cannot be predicated on dissecting the
marks into their various components; that is, the decision must be based on the
entire marks, not just part of the marks. *In re Nat'l Data Corp.*, 753 F.2d 1056, 224

9

Opposition No. 91190485

USPQ 749, 751 (Fed. Cir. 1985); *see also Franklin Mint Corp. v. Master Mfg. Co.,*
667 F.2d 1005, 212 USPQ 233, 234 (CCPA 1981) ("It is axiomatic that a mark
should not be dissected and considered piecemeal; rather, it must be considered as a
whole in determining likelihood of confusion."). On the other hand, different
features may be analyzed to determine whether the marks are similar. *Price Candy
Co. v. Gold Medal Candy Corp.,* 220 F.2d 759, 105 USPQ 266, 268 (CCPA 1955). In
fact, there is nothing improper in stating that, for rational reasons, more or less
weight has been given to a particular feature of a mark, provided the ultimate
conclusion rests on a consideration of the marks in their entireties. *In re Nat'l Data
Corp.,* 224 USPQ at 751.

Where, as here, the services are identical, the degree of similarity between
the marks necessary to find likelihood of confusion need not be as great as where
there is a recognizable disparity between the services. *See Century 21 Real Estate
Corp. v. Century Life of America,* 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir.
1992); *Jansen Enters. Inc. v. Rind,* 85 USPQ2d 1104, 1108 (TTAB 2007).

The mark applicant seeks to register is REAL CHOICE. Opposer's registered
mark is CLEARCHOICE DENTAL IMPLANTS, with DENTAL IMPLANTS – the
generic term for both parties' identified services – disclaimed. It is well-settled that
disclaimed, descriptive matter may have less significance in likelihood of confusion
determinations. *See Cunningham v. Laser Golf Corp.,* 55 USPQ2d at 1846
("Regarding descriptive terms, this court has noted that the 'descriptive component
of a mark may be given little weight in reaching a conclusion on the likelihood of

10

Opposition No. 91190485

confusion.'") (*quoting In re Nat'l Data Corp.,* 224 USPQ at 752); *In re Code Consultants, Inc.,* 60 USPQ2d 1699, 1702 (TTAB 2001) (disclaimed matter is often "less significant in creating the mark's commercial impression"). Thus, though we compare the marks REAL CHOICE and CLEARCHOICE DENTAL IMPLANTS in their entireties, we give more weight to the distinctive portions of the two marks: REAL CHOICE and CLEARCHOICE.

The absence of a space between the words CLEAR and CHOICE in opposer's registration does not significantly impact the commercial impression made by its mark, as consumers are still likely to recognize the individual component words CLEAR and CHOICE. In appearance and sound, REAL CHOICE and CLEARCHOICE are similar; each prefaces the word CHOICE with a one-syllable term featuring a long "e" vowel sound framed by consonants. Indeed, REAL is an anagram of CLEAR minus the "c."

Applicant disputes opposer's contention that CLEAR and REAL have similar meanings. Nonetheless, opposer provided a thesaurus listing "real" as one of many synonyms for the adjective "clear."[6] Although we do not view the phrases REAL CHOICE and CLEARCHOICE as exact synonyms, their connotations are related.

Overall, applicant's REAL CHOICE mark makes a commercial impression similar to opposer's registered mark CLEARCHOICE DENTAL IMPLANTS, particularly considered in the context of the parties' identical identified services. The first *du Pont* factor weighs in opposer's favor.

---

[6] J.I. RODALE, THE SYNONYM FINDER 174 (1978), Opposer's Reply Brief, Exhibit A.

11

Opposition No. 91190485

C.    Conditions of Sale and Consumer Sophistication

Under the fourth *du Pont* factor, we consider the conditions under which and buyers to whom sales are made. The evidence shows that dental implant services can be very expensive, costing from $10,000 to $50,000.[7] We are constrained, however, to consider the parties' "dental implant services" as they are recited in the application and registration, which are not limited to services of any certain price. Moreover, there is no evidence establishing that purchasers of dental implants are sophisticated.[8] The Board has previously noted that, "in purchasing healthcare services, even ordinary consumers are likely to exercise greater care and will know with whom they are dealing." *Carefirst of Md., Inc. v. FirstHealth of the Carolinas Inc.*, 77 USPQ2d 1492, 1504 (TTAB 2005). Yet even assuming that ordinary consumers tend to exercise some sophistication when purchasing healthcare services, careful or sophisticated purchasers are not immune from source confusion where similar marks are used in connection with related services. *See In re Research & Trading Corp.*, 793 F.2d 1276, 230 USPQ 49, 50 (Fed. Cir. 1986) ("'Human memories even of discriminating purchasers . . . are not infallible.'") (quoting *Carlisle Chem. Works, Inc. v. Hardman & Holden Ltd.*, 434 F.2d 1403, 168 USPQ 110, 112 (CCPA 1970)).

We find that the similarities between the marks and the goods sold thereunder outweigh any sophisticated purchasing decision. *See HRL Assocs. Inc.*

---

[7] Boyd Transcript at 36:7-10, 84:5-20.

[8] Opposer's manager Steve Boyd testified that both parties offer their services to "[a]nybody who is missing one, several or all of their teeth or needs to have their bad teeth replaced." *Id.* at 115:16-18.

Opposition No. 91190485

*v. Weiss Assocs. Inc.*, 12 USPQ2d 1819, 1823 (TTAB 1989), *aff'd, Weiss Assocs., Inc. v. HRL Assocs., Inc.*, 902 F.2d 1546, 14 USPQ2d 1840 (Fed. Cir. 1990) (similarities of goods and marks outweigh sophisticated purchasers, careful purchasing decision, and expensive goods). Thus, the fourth *du Pont* factor is neutral.

D.     Fame of Opposer's Mark

The fifth *du Pont* factor requires us to consider the fame of opposer's marks. Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use. A famous mark has extensive public recognition and renown. *Bose Corp. v. QSC Audio Prods. Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002).

Fame may be measured indirectly by the volume of sales and advertising expenditures of the services identified by the marks at issue, "the length of time those indicia of commercial awareness have been evident," widespread critical assessments and notice by independent sources of the services identified by the marks, and by the general reputation of the services. *Id.,* 63 USPQ2d at 1305-09. Some context in which to place raw numbers of product sales and advertising expenses may be necessary (*e.g.,* the substantiality of the sales or advertising figures for comparable types of products or services). *Id.* at 1309. Finally, because of the extreme deference that we accord a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting that its mark is famous to clearly prove it. *Leading Jewelers Guild Inc. v. LJOW Holdings LLC,* 82 USPQ2d 1901, 1904 (TTAB 2007).

13

Opposition No. 91190485

Opposer's evidence falls woefully short of establishing the fame of its mark. Opposer provides only scant, indirect evidence of fame in the form of testimony that it currently has 32 centers in 21 geographic marketplaces nationwide;[9] that it has treated "thousands" of customers;[10] and that its centers spend $1 million per month advertising its services.[11] Conspicuous in its absence is any evidence, whether direct or indirect, that opposer's efforts to publicize its mark have succeeded in garnering consumer or third-party recognition of its mark. Applicant provides no evidence as to its sales or share of the dental implant services market, no detail as to how many "thousands" of customers it has treated nationwide, no evidence as to the time frame during which it has spent $1 million per month on advertising,[12] and little specific evidence by which we could determine the forms of opposer's

---

[9] Deutsch Transcript at 16:5-8.

[10] *Id.* at 31:5-32:10.

[11] Boyd Transcript at 118:20-119:7. Applicant argues in its brief that testimony by Mr. Boyd regarding opposer's advertising expenditures is inadmissible because he lacked personal knowledge under FED. R. EVID. 602. We note that applicant's counsel did not object to this testimony at deposition. We also disagree with applicant's argument because, not only was Mr. Boyd designated as opposer's corporate representative, he also testified that he had personal knowledge of this subject. Boyd Transcript at 118:20-119:2. Applicant also objects that evidence of opposer's advertising expenditures should have come from original documents pursuant to FED. R. EVID. 1002. *See* Applicant's Brief at 22-23. In this case, any written evidence of advertising expenditures would fall under FED. R. EVID. 1004(d), an exception to the "best evidence rule" embodied in Rule 1002, because such documents are "not closely related to a controlling issue." *See Mag Instrument, Inc. v. Brinkmann Corp.*, 96 USPQ2d 1701, 1707-08 (TTAB 2010), *aff'd*, No. 2011-1052, -1053 (Fed. Cir. Nov. 9, 2011). Thus, we see no reason to exclude Mr. Boyd's oral testimony. In any event, should admission of Mr. Boyd's testimony be held erroneous on appeal, the error is harmless because opposer's advertising expenditures are insufficient to prove fame and do not affect our finding on *du Pont* factor 5 or our holding herein.

[12] There is no record support for opposer's assertion in its brief that opposer has spent a total of nearly $84 million on advertising. Opposer's Brief at 17. Presumably, this figure was derived simply by multiplying $1 million by the number of months opposer has been in existence. No witness testified that opposer has spent $1 million in advertising each month since it began doing business, and such a conclusion is unsupported by any record evidence.

Opposition No. 91190485

advertising and how that advertising uses opposer's mark.[13]  Because opposer has

not proven that its mark is famous, the fifth *du Pont* factor is neutral.

E.    Extent of Concurrent Use and Actual Confusion

Among the final relevant *du Pont* factors, factor 7 assesses the nature and

extent of any actual confusion, while factor 8 is the length of time during and

conditions under which there has been concurrent use without evidence of actual

confusion.

Proof of actual confusion is not necessary to show a likelihood of confusion,

and its absence is not dispositive. *See Giant Food, Inc. v. Nation's Foodservice, Inc.*,

710 F.2d 1565, 218 USPQ 390, 396 (Fed. Cir. 1983).  A showing of actual confusion

would of course be highly probative, if not conclusive, of a likelihood of confusion.

Yet the opposite is not true; the lack of evidence of actual confusion carries little

weight. *See J. C. Hall Co. v. Hallmark Cards, Inc.*, 340 F.2d 960, 144 USPQ 435,

438 (CCPA 1965).

The parties had coexisted for approximately 4½ years at the time of the oral

hearing, since applicant first used the REAL CHOICE mark in February 2009,

without evidence of actual confusion.[14]  However, applicant contends, and opposer

---

[13] *See, e.g.*, Boyd Transcript at 81:7-12 (stating that opposer advertises via television, newspaper, radio, billboards, magazines, direct mail, and the Internet), 104:15-105:5 (stating that some of opposer's ads feature celebrities Mike Ditka and Tony Curtis), and Exhibit 4-23 (2009 newspaper ad for opposer featuring Mike Ditka).  Although 85% of the respondents to opposer's survey – which will be discussed further *infra* – said they had heard of ClearChoice, we give this result no weight in our fame analysis because the survey universe was selected from a list of individuals who opposer said had contacted it within the preceding three years, presumably all of whom should be familiar with opposer.

[14] *See* Boyd Transcript at 10:16-18; Niznick Transcript at 27:5-9; Exhibits 20 and 22, applicant's response to opposer's interrogatory No. 4.

Opposition No. 91190485

does not dispute, that there are only three markets where both marks are in use: Atlanta, San Francisco, and Washington, D.C.,[15] limiting the opportunities for actual confusion to arise. *Du Pont* factor 8 is therefore neutral.

Opposer submitted a survey, which can be regarded as evidence of actual confusion. *See Blue Cross & Blue Shield Ass'n v. Harvard Cmty. Health Plan Inc.*, 17 USPQ2d 1075, 1078 n.7 (TTAB 1990). However, while we will not address and do not necessarily accept all the critiques of that survey in the analysis by applicant's expert Hal Poret, the survey still suffers from numerous serious flaws.

First and foremost, the survey did not follow an established format to measure likelihood of confusion, but was created by opposer's expert in a design never before used in a trademark survey or accepted by any court.[16] The survey combined tests of applicant's mark REAL CHOICE and a different third-party mark opposer is challenging (represented as RIGHT CHOICE),[17] an approach the Poret analysis criticized. It also used a small number of respondents to test each mark: 90. Mr. Poret pointed out that smaller samples produce larger error rates, and we have found similar numbers of survey respondents insufficient. *See Zimmerman v. Nat'l Ass'n of Realtors*, 70 USPQ2d 1425, 1436 (TTAB 2004) (96 survey subjects too low); *In re Kimpton Hotel & Rest. Group, Inc.*, 55 USPQ2d 1154, 1157 (TTAB 2000) (100 respondents insufficient).

---

[15] Applicant's Brief at 14. How long the parties' services have overlapped in these markets is unknown.

[16] *See* Rappeport Transcript at 62:23-65:17.

[17] The Rappeport survey report ("Rappeport Report") states that the name RightChoice is used by a dental practice in New York City that offers dental implantation. *Id.* at 1.

Opposition No. 91190485

In addition, rather than following the accepted approach of using a survey
universe comprising potential consumers of applicant's dental implant services,[18]
opposer's survey was conducted among a sample of 150,000 customers who had
contacted opposer within the preceding three years and did not live in the 19
markets[19] where applicant offers its services. Thus, the survey universe was
purposely selected to be aware of opposer[20] and not applicant.[21] Moreover,
respondents were asked only whether they were familiar with dental implants, not
if they were prospective consumers of dental implants.[22]

The survey was designed, in relevant part, to test the hypothesis that:
"When potential consumers who are aware of ClearChoice encounter the name
RealChoice used in the context of dental implant services, they are likely to confuse
it with ClearChoice."[23] During the survey, respondents were told that the

---

[18] 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR Competition § 32:159
(4th ed. 2013) ("In a traditional case claiming 'forward' confusion, not 'reverse' confusion,
the proper universe to survey is the potential buyers of the *junior user's* goods or services.
. . . A survey of the wrong 'universe' will be of little probative value in litigation.").

[19] *See* Exhibit 22, attachment to applicant's supplemental responses to opposer's
interrogatories.

[20] The Poret analysis raises questions as to whether this assumption underlying the survey
hypothesis and design was borne out by the results. Some 15% of the 180 total survey
respondents said that they had never heard of CLEAR CHOICE, while another 38% said
they had never had contact with CLEAR CHOICE, for a total of 53% – more than half.

[21] *See* Rappeport Transcript at 34:9-13 (answering that survey respondents were from
"places RealChoice was not available. That's the whole point."). Surveys in which the
target population was consumers of the plaintiff's product have been criticized for not
studying the full range of potential customers. *See* Shari Seidman Diamond, *Reference
Guide on Survey Research, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359, 379
(3d ed. 2011).

[22] Questionnaire, Appendix A to Rappeport Report, at 1.

[23] Rappeport Report at 2.

17

interviewer would read them the names of companies that provide dental implant

services, and asked whether they had heard of the two marks at issue here; 45

heard CLEAR CHOICE first followed by REAL CHOICE, while the other 45 heard

the marks in reverse order. Respondents were also asked about the control name

RIGHT OPTION during the portion of the survey relevant here. The results were:

- 86% of the 90 respondents said they had heard of CLEAR CHOICE, 13% had not heard of it, and 1% were not sure;

- 27% of the 45 respondents [i.e., 12 people] who heard REAL CHOICE before CLEAR CHOICE said they had heard of REAL CHOICE while 73% had not heard of it;

- 4% of the 45 respondents [i.e., 2 people] who heard REAL CHOICE after CLEAR CHOICE said they had heard of it, 96% had not heard of it; and

- 3% of the 90 respondents said they had heard of the control name RIGHT OPTION and 97% had not heard of it.[24]

The survey then combined "the estimates of guessing and prior actual

contact" with both names tested, REAL CHOICE and RIGHT CHOICE, to increase

statistical reliability of what the survey author considered to be noise, arriving at a

figure of 6%. This 6% "estimate of the guessing/prior contact" was subtracted from

the 27% result to yield a 21% result for the name REAL CHOICE. In a second

measure of noise, the survey again combined respondents who said they had heard

of the controls across both names tested to arrive at a 4% estimate of noise, yielding

a 23% result for the name REAL CHOICE.

In sum, 21% to 23% more survey respondents said they had heard of CLEAR

CHOICE and not REAL CHOICE when questioned about the terms in that order

---

[24] *Id.* at 9.

Opposition No. 91190485

than when asked with the terms in reverse order. Opposer's expert contends that this result shows confusion in those percentages; that is, that 21% to 23% of potential consumers who are aware of CLEAR CHOICE and encounter the name REAL CHOICE in the context of dental implant services are likely to confuse it with CLEAR CHOICE.[25]

Survey respondents also were asked follow-up questions:

> Q1a. What, if anything, can you tell me about [INSERT NAME], aside from the fact that they provide dental implant services?

> Q1b. By any chance, have you or has anyone in your household ever had any contact with [INSERT NAME]?

Those respondents who said they or someone in their household had contact with the company were asked:

> Q1c. By any chance, have you or has anyone in your household ever had any work done by [INSERT NAME]?

However, opposer's expert report does not address the responses to these follow-up questions, and they apparently were not factored into the survey results.

Mr. Poret contends in his analysis that, among the 24 respondents who were asked about REAL CHOICE or RIGHT CHOICE before CLEAR CHOICE and answered that they had heard of REAL CHOICE or RIGHT CHOICE, 16 respondents gave additional answers indicating that they were not confused by the test names. Mr. Poret states that four subjects said they had not heard of CLEAR CHOICE, so they could not be experiencing source or trademark confusion between

---

[25] *Id.* at 12.

19

the parties. According to Mr. Poret, 12 other subjects gave responses suggesting that they recognize the parties here (or the user of the RIGHT CHOICE mark) as separate entities and were not confused.[26] Mr. Poret argues that this leaves only 8 out of 90 respondents who possibly could have been confused, that is, less than 9% of respondents before accounting for survey noise and margin of error.

Given that opposer characterizes its mark as famous, we question why opposer's expert chose not to follow the *Ever-Ready*[27] survey format, which we have accepted and which has been called the "gold standard" in likelihood of confusion cases.[28] 6 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 32:173.50 (4th ed. 2013) (quoting J.B. Swann, *Likelihood of Confusion Studies and the Straightened Scope of Squirt*, 98 Trademark Rep. 739, 746 (2008)); *see also Starbucks U.S. Brands, LLC v. Ruben*, 78 USPQ2d 1741, 1753 (TTAB 2006) (stating "given the way in which this survey format carefully follows the *Ever-Ready* likelihood of confusion survey format, we find that it is reliable and therefore of probative value on the issue of likelihood of confusion herein").

---

[26] According to Mr. Poret, these 12 individuals said during the survey that they had contacted one but not the other of the parties (or RIGHT CHOICE), indicating that they understood them to be distinct sources.

[27] *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 188 USPQ 623 (7th Cir. 1976). In that case, plaintiff Union Carbide conducted a survey to determine whether there was a likelihood of confusion between defendant's EVER-READY lamps and plaintiff's EVEREADY batteries, flashlights and bulbs. The survey asked: "Who do you think puts out the lamp shown here? [showing a picture of defendant's EVER-READY lamp and mark]," "What makes you think so?" and "Please name any other products put out by the same concern which puts out the lamp shown here." *Id.* at 640.

[28] Opposer's expert testified that he designed the survey to test initial interest confusion. *See* Rappeport Transcript at 37-39. Our primary reviewing court has not embraced the theory of initial confusion. *Weiss Assocs., Inc. v. HRL Assocs., Inc.*, 902 F.2d 1546, 14 USPQ2d 1840, 1842-43 (Fed. Cir. 1990).

Opposition No. 91190485

Because we cannot conclude that opposer's survey actually measured an appreciable likelihood of confusion, we give it no weight in our analysis. *See In re Hotels.com, L.P.*, 87 USPQ2d 1100, 1109-10 (TTAB 2008), *aff'd, In re Hotels.com LP*, 573 F3d 1300, 91 USPQ2d 1532 (Fed. Cir. 2009). *Du Pont* factor 7 is neutral.

F.    Applicant's Intent

Finally, opposer emphasizes that applicant initially adopted a logo that was virtually identical to opposer's logo, including incorporating the same shooting star design, and that applicant copied elements of opposer's website.    In response, applicant's CEO, Dr. Niznick, did not deny that applicant initially used a logo incorporating a shooting star in the same manner as opposer's logo, but emphasized that it was changed promptly after opposer objected. Dr. Niznick testified:

> . . . I told my IT people, "We want to put together a Web site that we could offer to doctors," and I referred them to the ClearChoice Web site as an example of the kind of patient information that we would need, just like I look at [dental implant maker] Nobel's Web site or anybody else's. This is what they came up with.
> As soon as your client contacted us and objected to it, I immediately changed and responded and went to something that is very distinct from – in the look, eliminating the star, putting an implant in, different color background, different font.[29]

Bad faith, or intent to confuse, falls under the thirteenth *du Pont* factor, "any other established fact probative of the effect of use." *L.C. Licensing Inc. v. Berman*, 86 USPQ2d 1883, 1890 (TTAB 2008).    "[A] party which knowingly adopts a mark similar to one used by another for related goods should not be surprised to find

---

[29] Niznick Transcript at 27:16-28:1.

Opposition No. 91190485

scrutiny of the filer's motive." *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1442 (TTAB 2012). "[W]here there is evidence of an applicant's intent to adopt a mark that suggests to purchasers a successful mark already in use by another, the Board may, and ought to, take into account that intent when resolving the issue of likelihood of confusion when that issue is not free from doubt." *First Int'l Servs. Corp. v. Chuckles Inc.*, 5 USPQ2d 1628, 1633 (TTAB 1988). However, "an inference of 'bad faith' requires something more than mere knowledge of a prior similar mark." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 4 USPQ2d 1793, 1798 (Fed. Cir. 1987). A finding of bad faith must be supported by evidence of an intent to confuse, rather than mere knowledge of another's mark or even an intent to copy. *See, e.g., Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 92 USPQ2d 1769, 1782 (2d Cir. 2009) ("[T]he only relevant intent is intent to confuse. There is a considerable difference between an intent to copy and an intent to deceive.") (quotation omitted).

In light of applicant's change to its logo after contact by opposer, we cannot conclude that applicant manifested a bad-faith intent to deceive consumers, even if it did intend to copy opposer's logo and website. We therefore find the final likelihood of confusion factor to be neutral.

<u>Weighing the Factors</u>

We have carefully considered all of the record evidence pertaining to the relevant *du Pont* factors, as well as the parties' arguments with respect thereto (including any evidence and arguments not specifically discussed in this opinion). All relevant factors either favor opposer or are neutral. On balance, we find by a

22

preponderance of the evidence that applicant's REAL CHOICE mark is likely to cause confusion with opposer's mark CLEARCHOICE DENTAL IMPLANTS when used in association with dental implant services. To the extent we have any doubt, it must be resolved in favor of the prior registrant. *Nike Inc. v. WNBA Enters. LLC,* 85 USPQ2d at 1202; *Hard Rock Cafe Int'l (USA) Inc. v. Elsea,* 56 USPQ2d 1504, 1514 (TTAB 2000).

<div align="center">Likelihood of Dilution by Blurring</div>

We conclude by briefly addressing opposer's claim that applicant's mark will dilute its mark under Trademark Act § 43(c), 15 U.S.C. § 1125(c), by blurring its distinctiveness. To prevail on a dilution claim, opposer must prove that: (1) its mark is famous, (2) its mark became famous prior to the date of the application to register the applicant's mark, and (3) applicant's mark is likely to blur the distinctiveness of the opposer's famous mark. *Nike, Inc. v. Maher,* 100 USPQ2d 1018, 1023 (TTAB 2011).

Dilution requires a more stringent showing of fame than likelihood of confusion. *Coach Servs. Inc. v. Triumph Learning LLC,* 668 F.3d 1356, 101 USPQ2d 1713, 1724 (Fed. Cir. 2012). For all the same reasons we have determined that opposer has not met its burden to prove that its mark is famous for purposes of likelihood of confusion, opposer has not met its higher burden to prove fame in the dilution context, and its dilution claim must fail. *See id.* at 1727.

*Decision:* The opposition is sustained on the ground of likelihood of confusion pursuant to Section 2(d) of the Trademark Act and dismissed as to likelihood of dilution under Trademark Act Section 43(c).

<div align="center">23</div>